IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 24-30422 |
| | ) | (Chapter 11) |
| JAMIESON CAPEX FUND, LLC. | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

### SURREPLY TO REPLY TO SECTION 1188(b) REPORT

Comes now Jamieson CAPEX Fund, LLC ("CAPEX" or the "Debtor"), by and through undersigned counsel, as well as Maurice VerStandig and The Dakota Bankruptcy Firm ("Counsel"), on their own behalf, pursuant to Section 1188(b) of Title 11 of the United States Code, and in response to the Reply to Status Report (the "Reply," as found at DE #28) filed by the United States Trustee (the "UST") state as follows:

**I.      Introduction**

One day after the second session of the meeting of creditors herein, and without any advanced notice or discussion, the UST has suggested that both Jeremy Carlson ("Mr. Carlson"), the client representative of the Debtor, and Counsel, hold impermissible conflicts of interest that will, at some ill-defined juncture in the future, result in an effort to either replace CAPEX as the debtor-in-possession or convert this matter to Chapter 7. Any such effort would be misplaced, with the assertions concerning Mr. Carlson being factually infirm and with the assertions concerning Counsel being legally errant.

For the avoidance of doubt, and as discussed in greater detail below, Counsel learned— post-petition—that a separate client, represented in a narrow capacity in a separate matter, was not merely the Debtor's registered agent but, too, had formerly served as the Debtor's president. Counsel did not represent this separate client when he served as the Debtor's president and has

1

never advised this separate client in connection with any matters related to the Debtor's affairs. The Debtor does not hold any apparent claims against this separate client. And this separate representation was disclosed when counsel sought to be employed herein. But the UST is correct that a supplemental declaration should have been filed when it was learned the separate client had, too, formerly been the Debtor's president. A supplemental declaration is appended hereto as Exhibit A.

The supplemental declaration does not, however, alter the eligibility of Counsel to serve herein. Such is very much not the reason a supplemental declaration was not originally filed (the failure was an oversight and not a cognizant effort or scheme). But, for analytical purposes, the ongoing absence of an impermissible conflict, on the part of Counsel, is noteworthy. Similarly, the ongoing absence of an impermissible conflict, on the part of Mr. Carlson, is perhaps even more noteworthy.

## II. Counsel's Disinterestedness

### a. Factual Background

While the UST's contentions concerning Mr. Carlson are appreciably more extensive and complex, the sole contention regarding the fitness of Counsel to represent the Debtor in this case concerns Brian Kounovsky ("Mr. Kounovsky"). As was disclosed at the time employment was sought herein, Counsel represents Mr. Kounovsky in connection with "five jointly administered cases in this Honorable Court and other related matters not currently pending in this Honorable Court." DE #4-1 at ¶ 12. That current and ongoing representation, of someone who is a former officer of the Debtor, does not present an impermissible conflict of interest and is not disqualifying of Counsel's ability to represent the Debtor herein.

2

Being careful to neither disclose client confidences nor to share information prejudicial to the interests of third parties, the representation of Mr. Kounovsky in "five jointly administered cases" may be readily understood to be an ongoing representation in the EPIC Companies cases for two reasons: (i) it is not believed that there exist any other five jointly administered cases in this Honorable Court; and (ii) the subject representation is a matter of public record, evidenced by a notice of appearance in those cases, *see* In re EPIC Companies Midwest, LLC, Case No. 24-30281 (Bankr. D.N.D. 2024) at DE #98. The representation of Mr. Kounovsky in "other related matters not currently pending in this Honorable Court" is, as indicated, confined only to "other *related* matters." For the avoidance of ambiguity, however, those "related" matters grow out of a uniform nexus of the EPIC Companies (including those not presently in bankruptcy) and do not now include—and never have included—CAPEX.

Counsel did not originally know Mr. Kounovsky was the former president of CAPEX for three reasons: (i) the representation of Mr. Kounovsky commenced well after he ceased being the president of CAPEX; (ii) the representation of CAPEX was never discussed with Mr. Kounovsky pre-petition; and (iii) the statement of financial affairs (which calls for a listing of former officers) was not drafted until after the petition for relief and application to be employed as counsel were filed. The filing of the CAPEX bankruptcy was—as with many Chapter 11 cases—a closely held confidence until the petition was docketed, with only the present directors of the entity, certain attorneys, and two members of Counsel's lay staff being privy to the details of the filing in advance.[1]

---

[1] A slightly larger group of persons, including the UST, were notified in advance that a Chapter 11 case would be imminently filed in this judicial district, as is customary. The identity of the Debtor was not disclosed to such persons, however, and Mr. Kounovsky was not one of the subject individuals given this more generic form of advanced notice.

**b. Disinterestedness**

The UST suggests Counsel is not disinterested in light of Mr. Kounovsky's former service as president of the Debtor. Reply, DE #28, at ¶ 1. This is not a legally meritorious contention. While Mr. Kounovsky is certainly not "disinterested," Counsel is and, at all times relevant, has been disinterested. Attorneys are not conflated with their clients, especially where representations touch discreet matters devoid of substantive overlap.

The UST cites to Section 101(14) of the Bankruptcy Code in support of this contention. Reply, DE #28, at ¶ 1. That statute provides:

> The term "disinterested person" means a person that—
>
> (A) is not a creditor, an equity security holder, or an insider;
>
> (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
>
> (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).

Counsel is not a creditor in this case, nor is Counsel an equity security holder or an insider. Similarly, Counsel has not been a director, officer, or employee of CAPEX in the preceding two years (or, for that matter, ever). And Counsel does not have any interests adverse to the estate— much less materially adverse to the estate—or any class of creditors or equity holders by reason of any relationship with the Debtor.

The UST posits that "[r]epresenting someone who served as an officer in the prior two years violates Section 101(14)(B)." Reply, DE #28, at ¶ 2. Yet this is not a faithful reading of the plain language of Section 101(14)(B) which, as cited above, prohibits representation by someone who *themselves* was "a director, officer, or employee of the debtor" in the preceding two years. 11

4

U.S.C. § 101(14)(B). This section does not speak to other clients of an attorney, much less expand this restriction to attorneys whose other clients may fall into these categories. And doing so would invite potentially absurd results, whereby a general practitioner representing a former (or even current) employee of the Worldwide Widget Company in a personal injury suit against a local shopkeeper could not, too, represent the Worldwide Widget Company in a Chapter 11 proceeding.

To be sure, just as in myriad Chapter 11 cases, Counsel has a pecuniary interest in seeing the Debtor successfully reorganize, insofar as it is likely (albeit not certain) Counsel will end up holding an administrative claim for fees and expenses over and above those secured by a pre-petition retainer. But that is the only financial relationship between Counsel and the Debtor, with all other aspects of the relationship being in the nature of a traditional attorney/client relationship. Counsel has no connection to the Debtor aside from this case, did not know the Debtor existed until approached about representing the Debtor in a bankruptcy proceeding, and was similarly naïve of Mr. Carlson's existence until approached in connection with a potential bankruptcy filing for CAPEX.

    **c. Pragmatic Issues**

The expansive definition of "disinterestedness" suggested by the UST, aside from being at odds with the plain language of the Bankruptcy Code, would prove enormously problematic if embraced—especially in this judicial district. Both the North Dakota Chapter 11 bar, and the North Dakota commercial real estate investment community, are palpably niche informal collectives. If the representation of one client, on a discreet set of matters, irreparably compromises the ability of an attorney to represent other clients, on unrelated matters, there will be a pragmatic hardship worked upon entities looking to reorganize in this Honorable Court.

5

Seventeen Chapter 11 cases have been filed in the United States Bankruptcy Court for the District of North Dakota, from January 1, 2022 through the present. Five law firms have accounted for all seventeen filings:

| Case Number | Debtor | Debtor's First Listed Counsel |
|---|---|---|
| 23-30132 | Christopher Wayne Glenn | Maurice VerStandig |
| 23-30246 | Bourbon Street LLC | Maurice VerStandig |
| 23-30247 | Petri Enterprises, LLC | Maurice VerStandig |
| 23-30248 | Gannett Peak, LLC | Maurice VerStandig |
| 23-30352 | Drain Services Inc. | Maurice VerStandig |
| 23-30416 | Bryant Portable Welding, Inc. | Erik A. Ahlgren |
| 24-30010 | Red River Subs, Inc. | Maurice VerStandig |
| 24-30152 | Stark Energy, Inc. | Caren W. Stanley |
| 24-30168 | The Fargo Brewing Company, LLC | Erik A. Ahlgren |
| 24-30202 | Chad D. Hove | Sara Diaz |
| 24-30203 | Precisionomics, LLC | Sara Diaz |
| 24-30281 | EPIC Companies Midwest, LLC | Steven R Kinsella |
| 24-30282 | EPIC Companies Midwest 2023, LLC | Steven R Kinsella |
| 24-30283 | EPIC Employee, LLC | Steven R Kinsella |
| 24-30284 | EOLA Capital, LLC | Steven R Kinsella |
| 24-30285 | EC West Fargo, LLC | Steven R Kinsella |
| 24-30422 | Jamieson CAPEX Fund, LLC | Maurice VerStandig |

Further complicating matters, of the five law firms accounting for each of these filings, at least four have ultimately represented separate parties in the above-referenced matters or one of more related cases. By way of anecdote only, (i) Caren Stanley has represented creditors in several cases aside from the one in which she is counsel for the debtor; (ii) undersigned counsel is co-counsel for the debtor in one of the cases filed by Erik Ahlgren and represents Mr. Kounovsky in the five cases filed by Steven Kinsella, and (iii) Sara Diaz has filed individual cases for natural persons jointly obligated on the corporate debt of at least four Chapter 11 debtors whose cases were filed by undersigned counsel.

6

Not surprisingly, though less readily evidenced through a search of CM/ECF records, the North Dakota commercial real estate community is also relatively compact. Though there are very likely exceptions and outliers, it at least appears that most of the state's real estate investment community is no more than one step removed from at least one—if not many more—of the EPIC Companies. If representation of any parties in interest in the EPIC Companies bankruptcies is, in turn, disqualifying of representing debtors in other real estate-centric Chapter 11 cases, it would seem the pool of local debtor-side reorganizational attorneys may be quickly exhausted.

To be sure, this Honorable Court has an open bar and any attorney, from any state, can become admitted for purposes of filing a Chapter 11 case in North Dakota. This Honorable Court also makes it exceedingly easy for out-of-state attorneys to practice in Fargo, with a friendly policy on remote appearances and a readily-navigable set of Local Rules. But there is still some virtue—intangible as it may be—in a debtor being represented by an attorney familiar with a given court and the community in which that court is situated. And there is, too, an economic synergy in using the services of an attorney who does not need to expend hours reviewing local procedures for the first time, who has relationships with the local creditor bar, who has some functional understanding of how hearings normatively proceed in a given court, and who is ultimately reputationally reliant on her or his standing in the local insolvency community.[2]

All of which is to posit that disqualifying Counsel herein would create a problematic precedent as the local real estate economy appears primed for the filing of numerous Chapter 11 cases. Reading Section 101(14) as the UST suggests would, almost *ipso facto*, disqualify nearly the entire informal Chapter 11 bar of this Honorable Court from taking most new real estate-centric cases. And such would be a disservice not just to attorneys desiring to do the hard work of

---

[2] Where an attorney actually resides is, self-servingly, a slightly different issue.

corporate reorganizations but, too, the local businesses that would be best served by the counsel of attorneys with enduring ties to this Honorable Court.

### III. Mr. Carlson's Fitness to be the Debtor's Representative

#### a. Factual Background

The UST has appended six exhibits to the Reply, each concerning the dealings of some combination of (i) Mr. Carlson; (ii) entities presently—or formerly—helmed by Mr. Carlson; and (iii) the State of North Dakota Securities Department ("NDSD"). Tellingly, only two of the exhibits—those marked as numbers 2 and 3—actually concern CAPEX. And, similarly, only two of the exhibits—those marked as numbers 3 and 6—are in the nature of final adjudicative orders, with the other four being one-sided administrative filings analogous to civil complaints. What these documents show, collectively, is that NDSD leveled an expansive array of allegations against Mr. Carlson and various entities, only to ultimately enter into consent orders premised upon almost none of those allegations actually being accurate.

Exhibit 1 is a *sua sponte* suspension order that is not a final adjudicative document but, rather, that is in the nature of a collection of preliminary allegations. This order solely targets Mr. Carlson and Jamieson Capital Finance, LLC ("JCFL"), with CAPEX not being a party thereto. Exhibit 1 alleges that while Mr. Carlson and JCFL are both registered to work in the securities space, certain registration filings were either not submitted or were improperly completed. Exhibit 1, DE #28-1, at ¶¶ 1-3. As a result of these filings being incomplete, NDSD contended the affairs of JCFL to be those of an unregistered broker-dealer, *id.* at ¶ 3, and JCFL's custody of client funds to be accordingly improper, *id.* at ¶¶ 4-8. NDSD took issue with Mr. Carlson and JCFL utilizing federal, in lieu of state, registrations. *Id.* at ¶¶ 8-13. Exhibit 1 then goes on to discuss specific investments made by Mr. Carlson and JCFL, *id.* at ¶¶ 14-33, takes issue with one investment target

8

being potentially ill-suited for domestic investment, *id.* at ¶ 31, and raises concerns about another investment target concerning a medicinal entity that had not properly executed change-of-ownership paperwork, *id.* at ¶¶ 36, 38.

Exhibit 2 is also a *sua sponte* NDSD filing, containing one-sided allegations, in which the state entity takes aim at the payment of 3% commission payments made to Mr. Carlson, JCFL and/or one of two third parties. Exhibit 2, DE #28-2, *passim*. The NDSD acknowledges that the commission was disclosed to investors, *id.* at ¶ 16, and that the investment vehicles were federally registered, *id.* at ¶¶ 4-5, but contends that the federal registrations were insufficient to shield operations from the reach of state blue sky laws, *id.* at ¶ 17. There is no contention the commissions were unreasonable in nature. *Id.*, *passim*.

Exhibit 3 is an administrative consent order, to which CAPEX is a party. It is therein acknowledged that CAPEX has abided by NDSD's stop orders, Exhibit 3, DE #28-3, at ¶¶ 1-2, that CAPEX has changed management, *id.* at ¶ 3, and that the subject investment entities—including CAPEX—agree to stop selling securities until registration errors are fixed, *id.* at p. 4.

Some emphasis is properly placed on Exhibit 3 insofar as it is the only final order to which CAPEX is a party. NDSD leveled myriad allegations against CAPEX, suggested a failure to hew to red tape requirements would beget draconian ramifications, and then entered into a consent order whereby the state walked away from all of these allegations in exchange for the Debtor agreeing to fix its registration errors. That is truly stunning: NDSD basically shut down CAPEX, used the shut down as grounds to commandeer monies due and owing to CAPEX (which are still being held by the state), and then entered into a barely-face-saving consent order that allows CAPEX to carry on without restriction or condition so long as some paperwork is fixed. No damages are to be paid, no criminal actions are to be pursued, no fines are to be collected, and no

9

investors are in need of restitution; the consent order simply provides that some paperwork needs to be fixed.

Exhibits 4 and 5 are, like Exhibits 1 and 2, allegation-heavy unilateral pronouncements of NDSD, tantamount to civil complaints. Neither document implicates CAPEX, though both name Mr. Carlson and JCFL. The allegations are largely similar to those set forth in Exhibits 1 and 2, though they sometimes go both further and into darker territory. By way of anecdote, Exhibit 4 accuses Mr. Carlson of misappropriating client funds "by depositing client investment income payments into bank accounts he controls." Exhibit 4, DE #28-4, at ¶ 6. Exhibit 5 goes even further, alleging activities to be carried out "in a Ponzi like fashion. . ." Exhibit 5, DE #28-5, at ¶ 10(b).

Misappropriating client funds is a heavy allegation. Carrying on a business in a "Ponzi like fashion" is an even heavier allegation. So just what ultimately came of these serious, reputation-altering allegations, that NDSD would assuredly have researched diligently before leveling? Almost nothing. In Exhibit 6, the consent order bringing these sagas to a close, Mr. Carlson and JCFL acknowledge improper registrations and paperwork shortfalls, Exhibit 6, DE #28-6, at ¶¶ 4-5, deny any willful violations of the law, *id.* at ¶ 6, and agree that JCFL will not continue operations as an investment advisor, *id.* at ¶ 7.

Exhibit 6—to which CAPEX is *not* a party—also provides Mr. Carlson "agrees to use commercially reasonable best efforts to repay all members of the Private Funds who request repayment of their invested amounts. . ." *Id.* at ¶ 9.[3] In other words, if an investor wants to withdrew her, his, or its monies from a fund, Mr. Carlson is required to try to make that happen if commercially reasonable in nature. There is also a civil penalty assessed, but the consent order

---

[3] The Reply posits that CAPEX has consented to certain facts from the NDSD investigation. Reply, DE #28, at ¶ 6. To the extent the UST relies on Exhibit 6 in making this contention, such is in error; CAPEX is not a signatory to Exhibit 6.

10

provides for the penalty to "be immediately suspended for a period of 24 months." *Id.* at ¶ 15. In other words, the penalty is only a penalty is Mr. Carlson fails to abide by the terms of the consent order.

So, after an extensive, expansive, and allegation-rich campaign to paint Mr. Carlson as the master of a Ponzi-like scheme and to accuse Mr. Carlson of myriad bad acts, the NDSD settled on terms no more stringent than (i) insisting registration errors be fixed; and (ii) insisting clients be allowed to withdraw their money if commercially reasonable for withdrawals to be made. CAPEX and Mr. Carlson were ultimately never actually found to have intentionally done anything wrong.

To be sure, other issues are currently engulfing NDSD as well. The agency's leader has been implicated in a scandal involving her "double-dipping" on salaries and raises. Rob Port, *Gov. Doug Burgum cabinet member double-dipping on nearly $250,000 in salaries*, Fargo Forum, Oct. 5, 2024. And the agency's commissioner has, too, been implicated in nepotism-centric allegations concerning the employment of a family member who does not even reside in North Dakota. Rob Port, *Securities Commissioner has employed her daughter in her department*, Fargo Forum, Oct. 21, 2024.

The latter scandal may be more noteworthy, not because of the employment of the commissioner's daughter but, rather, because of the stated rationale for the employment: such was a cost-saving measure, aimed at allowing NDSD to retain additional legal counsel, since one of the agency's new attorneys "did not have adequate securities litigation experience. . ." *Id.* And lest that quotation seem hyperbolic, it bears mention that it is not the words of a columnist or an anonymous source but, rather, of the NDSD commissioner herself. *Id.*

11

### b. Lack of Conflict

The UST does not cite to any statutes or case law in asserting Mr. Carlson has an impermissible conflict of interest in operating CAPEX while the entity is a debtor in possession. Yet the UST is clear in indicating that it intends "to file a motion to replace the Debtor-in-Possession or convert the case to chapter 7." Reply, DE #28, at ¶ 8. Any such motion would be misplaced.

Since this is a Subchapter V case, any effort to remove CAPEX as the debtor-in-possession would be governed by Section 1185 of the Bankruptcy Code, which provides, *inter alia*:

> On request of a party in interest, and after notice and a hearing, the court shall order that the debtor shall not be a debtor in possession for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, either before or after the date of commencement of the case, or for failure to perform the obligations of the debtor under a plan confirmed under this subchapter.

11 U.S.C. § 1185(a).

While Mr. Carlson was certainly accused of fraud and dishonesty by NDSD, both allegations were ultimately abandoned by the state in the aforementioned consent orders. In fact, NDSD ultimately joined Mr. Carlson and CAPEX in agreeing that no intentional violations of the law occurred. So it would seem these first two grounds for removal are inapplicable *sub judice*. And, similarly, the final ground for removal—failure to perform under a confirmed plan—is likewise inapplicable for the plain reason that no plan has been proposed, much less confirmed, in this case as of present.

This leaves only incompetence and gross mismanagement. Yet if an evidentiary hearing were to be held on either of these fronts, such would only reveal—rather unsurprisingly—that when completing federal securities filings, and drafting customer-facing disclosures, Mr. Carlson

and CAPEX relied on the advice of securities counsel.[4] It is difficult to conceive of how relying on legal advice, from a licensed attorney, can subject one to colorable allegations of incompetence. It is similarly difficult to conceive of how such reliance on legal advice, even if the subject advice ended up being imperfect, would give rise to colorable allegations of gross mismanagement.

At core, CAPEX and Mr. Carlson were zealously pursued by a state agency that was both legally and factually ill-informed. This pursuit exacted an enormous toll, begetting this bankruptcy case. Yet this pursuit ended in a scant whimper, with NDSD realizing it had markedly overreached and with everyone agreeing that (i) paperwork should be properly completed in the future; and (ii) investors should be allowed to withdraw their monies from funds when and where commercially reasonable. Those are both conditions that existed before NDSD began its investigations; of course paperwork should be properly completed, and of course investors should be allowed to withdraw their monies when feasible. And it is thusly concerning for the UST to now point to this ill-fated state-level administrative inquiry as fodder to disrupt a bankruptcy that, not coincidentally, is designed to remedy the economically deleterious impact of that same ill-fated state-level administrative inquiry.

    **c. Alternative Options**

While CAPEX and Mr. Carlson firmly believe this cause ought to proceed with Mr. Carlson at the helm of the Debtor, a Friday afternoon filing such as the Reply, from an entity as respected as the UST, does necessarily invite a weekend punctuated more by work than leisure. Based on these weekend efforts, CAPEX can report that it is in the process of interviewing two potential candidates to serve as a chief restructuring officer ("CRO") should the need so arise (and

---

[4] For the avoidance of ambiguity, undersigned counsel was not the Debtor's securities attorney. As noted *supra*, undersigned counsel was engaged shortly pre-petition and solely for purposes of representing CAPEX in connection with a bankruptcy filing and related adversary proceedings.

13

only if the need so arises). One candidate is a seasoned insolvency attorney with extensive experience navigating real estate holding companies through the Chapter 11 process and representing Chapter 7 trustees. The other candidate is the former deputy mayor of a major American city, manages a real estate consulting firm, and formerly helmed a company managing more than $400 million in real estate assets.

CAPEX is cognizantly not identifying either candidate for a CRO position in this filing, and may interview at least one additional candidate in the coming days. But should the UST file a motion to dispossess the Debtor, CAPEX will shortly thereafter docket a conditional application to appoint a third party as a CRO, asking such relief be granted if—and only if—the UST otherwise establishes cause sufficient to dispossess the Debtor.

A CRO would be enormously expensive in this case but so, too, would be placing the Subchapter V trustee in possession of the Debtor. Though this bankruptcy is aimed at liquidating litigation assets, the Debtor does need to be managed, throughout the Subchapter V process, by someone experienced in the operation of commercial real estate assets and investments and, too, capable of meaningfully directing counsel in connection with the management of bankruptcy litigation cases. As of present, Mr. Carlson is tending to these obligations on a *gratis* basis, eager to do right by the investors who have placed their money with CAPEX. Displacing Mr. Carlson would only serve to occasion a loss of his institutional knowledge, the incursion of an enormous sum of added administrative expenses, and a loss of temporal momentum in a Subchapter V case that is designed to move expeditiously.

As such, it is sincerely hoped the UST will reconsider its position and forbear from seeking to oust CAPEX as the debtor-in-possession, just as it is hoped the UST will reconsider its position on undersigned counsel lacking the requisite disinterestedness to proceed herein.

Respectfully Submitted,

Dated: November 10, 2024      By:     /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
The Dakota Bankruptcy Firm
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
Phone: (701) 394-3215
mac@dakotabankruptcy.com
*Counsel for the Debtor*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of November, 2024, a copy of the foregoing was served electronically upon filing via the ECF system.

/s/ Maurice B. VerStandig
Maurice B. VerStandig