IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 24-30422 |
| | ) | (Chapter 11) |
| JAMIESON CAPEX FUND, LLC. | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

## OPPOSITION TO MOTION TO RECONSIDER ORDER

Comes now Jamieson CAPEX Fund, LLC ("CAPEX" or the "Debtor"), by and through undersigned counsel, in opposition to the Motion to Reconsider Order (the "Motion," as found at DE #34) filed by the United States Trustee (the "UST"), and states as follows:

### I.    Introduction

The UST suggests counsel for CAPEX has a disqualifying conflict by reason of an ongoing separate representation and, as such, the employment of the Debtor's counsel ought to be reconsidered. While CAPEX strongly believes no conflict of interest to be present instantly, such an inquiry can be mooted through resolution of a question never expressly addressed in the Motion: May a chapter 11 debtor engage "conflicts counsel" to represent an estate's interests vis a vis a third party who is also a client of a debtor's general reorganization counsel? If so, the Motion merits denial, as the conflict suggested by the UST is both slighter than intimated (certain factual assertions are errant) and capable of being addressed by special conflicts counsel. If not, the matter becomes significantly more complicated, as the absence of an actual—or even potential—conflict militates against disqualifying CAPEX's counsel, as do the realities of practice in this Honorable Court.

As discussed *infra*, precedent exists—nationwide—for law firms to avoid disqualifying conflicts of interest in debtor-side chapter 11 work by employing special conflicts counsel. Even

1

the UST's own published regulations openly contemplate the use—and compensation—of conflicts counsel. Yet, upon diligent inquiry, there does not appear to be any binding precedent—one way or another—in this Honorable Court. And the Motion is thusly of some import not merely for this case but, too, for future cases. If the allowance of conflicts counsel is embraced, CAPEX and future entities petitioning for relief may have a path to efficient reorganization. If the allowance of conflicts counsel is not embraced, there is only scant hyperbole in suggesting the path for North Dakota small businesses to successfully reorganize will grow both harder and more expensive.

## II.    Relevant Facts

1.     The Dakota Bankruptcy Firm ("DBF") is counsel to Brian Kounovsky ("Mr. Kounovsky"). *See* Declaration of M. VerStandig ("VerStandig Dec."), attached hereto as Exhibit A ("Ex. A"), at ¶ 2.

2.     At the time the CAPEX bankruptcy was filed, DBF disclosed its representation of Mr. Kounovsky in connection with an application to be employed as counsel for the Debtor. *See* Declaration in Support of Application to Approve Employment of Maurice B. VerStandig, Esq. and The Dakota Bankruptcy Firm as General Reorganization Counsel to Above-Captioned Debtor, DE #4-1 at ¶ 12.

3.     Because DBF did not discuss Mr. Kounovsky's case with CAPEX, and did not discuss CAPEX's case with Mr. Kounovsky, DBF was not aware, at the time of filing this case or applying to be employed herein, that Mr. Kounovsky was the former president of CAPEX. VerStandig Dec., Ex. A, at ¶ 4.

4.     Mr. Kounovsky served as president of CAPEX from March 6, 2023 through May 22, 2024. *See* Minutes of Special Meetings, attached hereto as Exhibits B and C.

5.      DBF commenced representing Mr. Kounovsky not later than August 2024. *See* Notice of Appearance, *In re EPIC Companies Midwest, LLC*, Case No. 24-30281 (Bankr. D.N.D. 2024) at DE #98.

6.      Similarly, because DBF did not discuss Mr. Kounovsky's case with CAPEX, and did not discuss CAPEX's case with Mr. Kounovsky, DBF was not affirmatively aware, at the time of filing this case or applying to be employed herein, that Mr. Kounovsky owned an interest in JAMCO LLC ("JAMCO"), an entity that owes monies to CAPEX. VerStandig Dec., Ex. A, at ¶ 5.[1]

7.      While the UST asserts that Mr. Kounovsky, while serving as president of CAPEX, caused the Debtor to pay off approximately $1 million in loans, Motion, DE #24, at § 7, this assertion is counterfactual.[2] One of the two loans was paid by a third party, to another third party, with CAPEX being a solely-ministerial processor of funds. *See* Record of Repayment of NOVA Loan, attached hereto as Exhibit D. The other loan was "paid" involuntarily when the lender foreclosed on an asset of CAPEX securing the subject loan and credit bid a sum sufficient to retire the debt. *See* Order Confirming Sheriff Sale, attached hereto as Exhibit E.

8.      Mr. Kounovsky was, in his individual capacity, a junior lienholder on the property sold at foreclosure, and thereafter redeemed the property from foreclosure (subject to a first lien

---

[1] Solely with the aid of hindsight, it does appear DBF could theoretically have discovered this fact from certain records, at the time DBF was engaged to represent CAPEX. But DBF did not know this at the time. And, critically, DBF has never served as counsel to JAMCO, has never advised Mr. Kounovsky in connection with JAMCO's interests, and has never advocated for JAMCO in any context whatsoever, so JAMCO would not have appeared during an internal conflicts check. VerStandig Dec., Ex. A, at ¶ 6.

[2] For the avoidance of doubt, CAPEX does *not* suggest the UST knew this assertion to be counterfactual when filing the Motion. There is likely some misunderstanding attributable to how CAPEX's corporate designee answered questions at the meeting of creditors herein.

in favor of a third party bank) *after* the debt was satisfied by virtue of the lender's credit bid. *See* Sheriff's Certificate of Redemption, attached hereto as Exhibit F.

9.     There accordingly appear to be four factual connections between CAPEX and Mr. Kounovsky: (i) Mr. Kounovsky is the former registered agent of CAPEX; (ii) Mr. Kounovsky holds a *de minimis* equity interest in CAPEX of 0.01%; (iii) Mr. Kounovsky is the former president of CAPEX; and (iv) Mr. Kounovsky owns an interest in an entity that, in turn, owes money to CAPEX. The former two connections were disclosed in connection with DBF's employment application; the latter two were not disclosed because they were not known by DBF at the time of making the employment application.

10.     As part of the Plan, CAPEX has proposed engaging special conflicts counsel to represent the Debtor's interests in connection with any claims against Mr. Kounovsky or any entities owned in part by Mr. Kounovsky. Plan, DE #37, at § 7.03. Though the Plan intimates that special conflicts counsel will not be a local attorney and will, instead, likely be "from a mid-sized Midwestern city, with extensive bankruptcy experience," *id.*, the Plan never affirmatively identifies special conflicts counsel. At this time, CAPEX can disclose that Joy D. Kleisinger, Esq. ("Ms. Kleisinger"), of the Cincinnati office of Frost Brown Todd, has agreed to serve as special conflicts counsel in this case, in accord with the terms generally proposed in the Plan.[3] In so serving, Ms. Kleisinger will have the support of her law firm, including other attorneys in the bankruptcy department and, to the extent necessary, attorneys in the litigation department. Through counsel, CAPEX is informed that neither Ms. Kleisinger nor her firm have ever represented Mr. Kounovsky or JAMCO.

---

[3] On a purely technical level, an assessment is ongoing as to whether or not an amendment ought to be made to the Plan, clarifying how certain monies will be reserved for the payment of special conflicts counsel.

### III.    Argument: The Motion Should be Denied

#### a.  There is No Conflict

It is not clear that an actual conflict exists in this case. The Debtor does not appear to hold any claims against Mr. Kounovsky in his capacity as a *de minimis* equity holder or former registered agent. The claims the UST intimates against Mr. Kounovsky, for his work as president of CAPEX, are premised upon inaccurate factual assertions, as Mr. Kounovsky did *not* actually elect to pay nearly $1 million in debt during his tenure. And the conflict suggested by reason of Mr. Kounovsky's ownership interest in JAMCO conflates an entity and one of that entity's individual equity holders, being not a claim adverse to Mr. Kounovsky directly but, rather, one adverse to an entity that is legally distinct from Mr. Kounovsky.

Title 11 of the United States Code (the "Bankruptcy Code") permits a debtor in possession to, *inter alia*, "employ one or more attorneys . . . that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor in possession] in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a).[4]

The Bankruptcy Code specifically defines "disinterested person" as being a person that possesses three key qualities:

The term "disinterested person" means a person that—

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

(C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

---

[4] The interlineation of "debtor in possession," in place of "trustee," is occasioned by the allowances of Section 1107 of the Bankruptcy Code.

11 U.S.C. § 101(14).

There is no contention that DBF itself lacks disinterestedness; the firm and its attorneys are not creditors, equity holders or insiders; the firm and its attorneys have not been officers, directors, or employees of CAPEX in the past two years (or ever); and the firm and its attorneys do not hold any interests adverse to those of CAPEX and its estate. While the UST does expend a portion of the Motion discussing the standard of disinterestedness, it does not genuinely appear the UST is arguing DBF or either of the firm's attorneys lack this quality. The contention, rather, appears to be that DBF represents someone who lacks these qualities.

The language of Section 327 is important in this regard: counsel may not "represent an interest adverse to the estate." 11 U.S.C. § 327(a). This is notably narrow language, being not a *carte blanche* prohibition on the representation of persons or entities holding interests adverse to the estate but, rather, merely on the actual direct representation of interests adverse to the estate. And this is of particular import since DBF does not represent JAMCO and has never represented JAMCO.

As observed by the United States Court of Appeals for the Third Circuit, there are three scenarios contemplated by the relevant portions of Section 327:

> (1) Section 327(a), as well as § 327(c), imposes a per se disqualification as trustee's counsel of any attorney who has an actual conflict of interest; (2) the district court may within its discretion—pursuant to § 327(a) and consistent with § 327(c)— disqualify an attorney who has a potential conflict of interest and (3) the district court may not disqualify an attorney on the appearance of conflict alone.

*In re Marvel Entm't Grp.*, 140 F.3d 463, 476 (3d Cir. 1998). *See also In re Living Hope Se., LLC*, 495 B.R. 866, 872 (Bankr. E.D. Ark. 2012) (applying the *Marvel* standard in this judicial circuit); *Premier Farms L.C.*, 305 B.R. 717, 721 (Bankr. N.D. Iowa 2003) (same); *In re Huntco Inc.*, 288 B.R. 229, 234 (Bankr. E.D. Mo. 2002) (same).

Here, it very genuinely does not appear CAPEX holds any claims adverse to Mr. Kounovsky personally. No one is contending he erred in his duties as registered agent. No one is contending he has any liability as the holder of a 0.01% membership interest in the Debtor. And the UST's contentions about his actions as president of the Debtor are both factually inaccurate and not supportive of any claim against Mr. Kounovsky in any event.

CAPEX does, however, hold a claim adverse to JAMCO. But, under North Dakota law, "[a] limited liability company is an entity distinct from its members." N.D.C.C. § 10-32.1-07(1). Mr. Kounovsky is not JAMCO and JAMCO is not Mr. Kounovsky. And the Debtor's possession of an interest adverse to JAMCO is accordingly one degree too far removed to constitute an actual conflict of interest.

Similarly, under the second prong of the *Marvel* test, it does not appear there is even a potential conflict of interest in this case. There is not any readily identifiable scenario through which Mr. Kounovsky will owe money to the Debtor or through which the Debtor will have an interest in pursuing litigation claims against Mr. Kounovsky. Even if the UST were correct that Mr. Kounovsky elected to pay certain creditors of CAPEX, and not others, while serving as president of the entity (and, as noted *supra*, this is not an accurate contention), it is altogether unclear what claims could or would stem therefrom. CAPEX lacked funds to pay its debts as they came due because the North Dakota Securities Department commandeered the Debtor's monies— not because the entity cognizantly elected to prefer one creditor over another. Yet, even if a cognizant election had been made, such would not amount to a breach of fiduciary duty under North Dakota law for the simple reason that it was the actions of the North Dakota Securities Department in commandeering monies—and not an executive in electing how to apply funds—

that proximately occasioned any losses. *See, e.g.*, *Berger v. Sellers*, 996 N.W.2d 329, 343 (N.D. 2023) (setting forth the elements of a claim for breach of fiduciary duty).

To be sure, it is genuinely difficult to conceive of a plausible situation whereby CAPEX or its estate will have a claim against Mr. Kounovsky. And, as noted *supra*, a claim against JAMCO is legally immaterial, insofar as DBF does not represent JAMCO, an entity that is distinct from its members.

Moreover, even if there did exist a cognizable scenario where CAPEX might, one day, have a claim against Mr. Kounovsky, case law instructs that such a theoretical potential ought to be met not with disqualification but, rather, a "wait and see" approach whereby the issue is addressed when, and only when, the conflict actually arises. *See, e.g.*, *In re Universal Enters. of W. Va., LLC*, 2010 Bankr. LEXIS 1721, at *11-12 (Bankr. N.D.W. Va. June 9, 2010) (". . . if an actual conflict does arise, new counsel could be appointed at that time. Consequently, the court will adopt a wait and see approach based on the Debtor's and Alex Chevrolet's professed identity of interest and unity of purpose in rehabilitating Alex Chevrolet such that it will be able to meet its rent obligations to the Debtor."); *In re Platinum Oil Props., L.L.C.*, 2009 Bankr. LEXIS 4191, at *33-35 (Bankr. D.N.M. Dec. 23, 2009) ("In the circumstances of this case, the Court will take a 'wait and see' approach as to whether a conflict develops such that the estate should be required to retain separate counsel that does not represent Madison. If an actual conflict is developing or has developed while Counsel is employed by the Debtor as debtor-in-possession, or a potential conflict develops that is prejudicial to the estate, Counsel's employment status by the estate and its compensation may be revisited. This 'wait and see' approach has been taken by several courts, and is consistent with the notion that the Court has discretion to determine whether a potential conflict of interest is sufficient to warrant disqualification of counsel or denial of compensation. It is also

consistent with the language of 11 U.S.C. § 328(c), under which 'the court may deny allowance of compensation [to] . . . a professional person employed under section 327 . . . if, at any time during such professional person's employment . . . such professional person . . . represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.'") (quoting 11 U.S.C. § 328(c)).

This leaves only the third *Marvel* prong: the "appearance of conflict alone." Yet, as noted by the Third Circuit, such is not grounds to disqualify counsel. Perhaps more importantly, though, it is difficult to understand how the facts *sub judice* create even the appearance of conflict—especially when the Plan contains an express provision to engage special conflicts counsel for belt/suspender purposes.

### b. The Use of Conflicts Counsel Extinguishes the Putative Conflict

CAPEX is not legally required to employ conflicts counsel in this case. As noted above, DBF possesses neither an actual nor potential conflict of interest and, as such, DBF can advise the Debtor in all respects. Nonetheless, being aware of the UST having raised this issue, and having significant respect for the UST, CAPEX has promptly filed its Plan, setting forth a mechanism through which special counsel will be employed to overcome even the appearance of a conflict of interest (something that would not, unto itself, be disqualifying under *Marvel* and its progeny). While the use of such conflicts counsel has limited precedent in this Honorable Court, such should be approved—especially where, as here, the employment is under a plan of reorganization, springing post-confirmation and thereby avoiding any requirement that special counsel have previously represented a given debtor.

The use of conflicts counsel is often (albeit not always) accepted nationwide, being recognized not merely by case law but, too, by a leading treatise:

> Conflicts counsel is secondary counsel employed when lead bankruptcy counsel is subject to a limited, not pervasive, conflict of interest that prevents it from performing some small part of its duties, and/or in case lead bankruptcy counsel becomes subject to additional conflicts during the case, which are not necessarily known as of the petition date.

3 Collier on Bankruptcy P 327.03.

Perhaps more persuasive than Collier, though, is the UST's own guidelines, which openly contemplate the employment—and compensation—of conflicts counsel in chapter 11 cases: "Conflicts counsel is secondary counsel employed when lead bankruptcy counsel is subject to a limited, not pervasive, conflict of interest that prevents it from performing some small part of its duties." Appendix B Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under United States Code by Attorneys in Larger Chapter 11 Cases, 78 FR 36248, 36256 (June 17, 2013).

In fact, the UST's own regulations go so far as to acknowledge that the engagement of conflicts counsel is presumptively allowable except in situations where the conflict is inseparable from the work of general reorganization counsel:

> The following are circumstances that may indicate that the retention of conflicts counsel is inappropriate and should weigh in favor of an objection to the retention application of the lead counsel:
>
> i. The responsibilities of conflicts counsel are not confined to discrete legal matters.
>
> ii. The conflicts counsel will be used to handle matters that are inseparable from the major reorganization activities of the case (e.g., negotiation of major plan provisions).
>
> iii. The conflicts counsel will act under the direct supervision of, and at the direction of, the lead counsel.
>
> iv. The conflicts counsel's role will include filing or advocating pleadings that have been drafted by lead counsel.
>
> v. The conflicts counsel has been retained to litigate matters in which the lead counsel has represented the debtor in settlement negotiations.

vi. The debtor will not (or cannot) create an ethical wall to screen the lead counsel from the work of the conflicts counsel.

*Id.*

Applying the first criterion, the proposed role of special conflicts counsel is discrete in nature, as set forth in the Plan. Conflicts counsel is being engaged solely to investigate—and, if desirable, pursue—claims against Mr. Kounovsky and companies in which Mr. Kounovsky holds an interest; no more and no less. And, concerning the second prong of the UST's regulations, the role of conflicts counsel will not concern major activities like negotiating a plan of reorganization since the work of special conflicts counsel is provided for in the Plan itself, commencing post-confirmation.

Similarly, as to the third point, the proposed mechanism is one where special conflicts counsel will not be under the supervision of DBF or in any way reliant on DBF. And, vis a vis the related fourth point, special conflicts counsel will not be filing—or advocating for—any pleadings or documents drafted by DBF. The fifth rigor is similarly satisfied: DBF has not represented CAPEX in settlement negotiations with Mr. Kounovsky precisely because there are no apparent claims that would give rise to settlement discussions and no such settlement discussions have accordingly been had.

This leaves only the sixth requirement, and there is no reason to believe CAPEX will be incapable of separating its work with DBF from its work with special conflicts counsel. The Debtor is an investment fund, not a natural person. It will not be difficult for CAPEX to communicate solely with special conflicts counsel in connection with any claims against Mr. Kounovsky and JAMCO, while communicating with DBF about post-confirmation activities of a general variety.

Of course, the role of special conflicts counsel is not merely rooted in the UST's own regulations. Courts have, time and again, approved such relationships in chapter 11 cases. *See,*

11

*e.g.*, *In re Project Orange Assocs., LLC*, 431 B.R. 363, 375 (Bankr. S.D.N.Y. 2010) ("In many cases, the employment of conflicts counsel to handle issues where general bankruptcy counsel has an adverse interest solves most questions regarding the retention of general bankruptcy counsel."); *In re Enron Corp*., 2002 Bankr. LEXIS 1720, at *40 (Bankr. S.D.N.Y. May 23, 2002) (". . . Milbank has avoided the appearance of impropriety by the use of conflicts counsel and ethical walls."); *In re BSA*, 2020 Bankr. LEXIS 1486, at *30 (Bankr. D. Del. June 2, 2020) ("Conflicts counsel is often used by debtors when their main restructuring counsel cannot be adverse to a particular party in a bankruptcy case."); *In re Curare Lab. LLC*, 2022 Bankr. LEXIS 1413, at *62 (Bankr. W.D. Ky. May 18, 2022) ("The foregoing notwithstanding, the Court will require Kaplan to hire conflicts counsel to handle any matters where Arla is involved.").

One of the more thoughtful analyses of the role of conflicts counsel comes from the United States Bankruptcy Court for the District of New Mexico, which has explained:

> "In many cases, the employment of conflicts counsel to handle issues where general bankruptcy counsel has an adverse interest solves most questions regarding the retention of general bankruptcy counsel." The concept is that if conflict matters — matters in which general bankruptcy counsel's simultaneous representation of more than one debtor would pose a disqualifying conflict of interest — are carved out of the scope of general bankruptcy counsel's representation of the debtors, and are assigned to separate independent counsel, no actual conflict of interest can arise on the part of general bankruptcy counsel. The conflict matters are outside the scope of its representation. However, such use of conflicts counsel is not appropriate where the adverse interests of the debtors represented by the same general bankruptcy counsel are central to the reorganization efforts of either debtor or to other resolutions of the chapter 11 case or where the adverse interests are so extensive that each debtor should have its own independent general bankruptcy counsel

*In re WM Distribution, Inc*., 571 B.R. 866, 873 (Bankr. D.N.M. 2017) (quoting and citing *Project Orange*, 431 B.R. at 375).

These cases create a precedential framework that, not coincidentally, differs little from the UST's guidelines. The engagement of conflicts counsel is permissible where such is needed to

avoid a discreet conflict, but not permissible where such would still leave general reorganization counsel in the conflicted position of trying to negotiate a plan of reorganization that is centrally hostile to another client of the same attorney(s).

Again, DBF does not believe there is actually a conflict—or even a potential conflict—in this case. And, had any party in interest other than the UST been the one suggesting a conflict to be afoot, CAPEX likely would not have prophylactically provided for the employment of conflicts counsel in the Plan, being cognizant that the work of such counsel will require the payment of monies that could otherwise be distributed to creditors. But there is an abiding respect for the UST and the watchdog function served by that office, and CAPEX has accordingly done just as the UST urges in its own guidelines, seeking to work past even the appearance of a conflict by using special conflicts counsel.[5]

### c. Disallowing the Use of Conflicts Counsel Would have a Deleterious Impact on the Small Businesses Seeking to Reorganize in North Dakota

As previously observed in a surreply, DE #29,[6] there is also a pragmatic reason DBF's representation of Mr. Kounovsky ought not be disqualifying: the EPIC Companies bankruptcies (being the cases from which the alleged conflict *sub judice* arises) are sufficiently pervasive as to involve representation, of one interested party or another, of most of the local informal chapter 11 bar. Adopting a standard where these representations are *per se* disqualifying in cases involving

---

[5] Though not briefed in the Motion, it bears notation that any concerns about special conflicts counsel being outside the scope of Section 327(e), since Ms. Kleisinger has not previously represented the Debtor, are mitigated by the role of such counsel arising under the Plan and not through pre-confirmation employment. The language of Section 327(e) is generally not an obstacle to the employment of conflicts counsel in any event, but CAPEX is aware that some case law does suggest there to be a tension between this rigor and the role of conflicts counsel, so the Debtor has taken care to avoid the issue by engaging conflicts counsel post-confirmation.

[6] A significant portion of this section of the instant brief is verbatim identical to the surreply.

individuals and entities subsumed in the EPIC universe would, in turn, mean almost every reorganization attorney regularly practicing in this Honorable Court would be precluded from assuming most (albeit not all) new debtor-side real estate cases for the foreseeable future.

Seventeen Chapter 11 cases have been filed in the United States Bankruptcy Court for the District of North Dakota, from January 1, 2022 through the present. Five law firms have accounted for all seventeen filings:

| Case Number | Debtor | Debtor's First Listed Counsel |
|---|---|---|
| 23-30132 | Christopher Wayne Glenn | Maurice VerStandig |
| 23-30246 | Bourbon Street LLC | Maurice VerStandig |
| 23-30247 | Petri Enterprises, LLC | Maurice VerStandig |
| 23-30248 | Gannett Peak, LLC | Maurice VerStandig |
| 23-30352 | Drain Services Inc. | Maurice VerStandig |
| 23-30416 | Bryant Portable Welding, Inc. | Erik A. Ahlgren |
| 24-30010 | Red River Subs, Inc. | Maurice VerStandig |
| 24-30152 | Stark Energy, Inc. | Caren W. Stanley |
| 24-30168 | The Fargo Brewing Company, LLC | Erik A. Ahlgren |
| 24-30202 | Chad D. Hove | Sara Diaz |
| 24-30203 | Precisionomics, LLC | Sara Diaz |
| 24-30281 | EPIC Companies Midwest, LLC | Steven R Kinsella |
| 24-30282 | EPIC Companies Midwest 2023, LLC | Steven R Kinsella |
| 24-30283 | EPIC Employee, LLC | Steven R Kinsella |
| 24-30284 | EOLA Capital, LLC | Steven R Kinsella |
| 24-30285 | EC West Fargo, LLC | Steven R Kinsella |
| 24-30422 | Jamieson CAPEX Fund, LLC | Maurice VerStandig |

Further complicating matters, of the five law firms accounting for each of these filings, at least four have ultimately represented separate parties in the above-referenced matters or one or more related cases. By way of anecdote only, (i) Caren Stanley has represented creditors in several cases aside from the one in which she is counsel for the debtor; (ii) undersigned counsel is co-counsel for the debtor in one of the cases filed by Erik Ahlgren and represents Mr. Kounovsky in the five cases filed by Steven Kinsella, and (iii) Sara Diaz has filed individual cases for natural

14

persons jointly obligated on the corporate debt of at least four Chapter 11 debtors whose cases were filed by undersigned counsel.

Not surprisingly, though less readily evidenced through a search of CM/ECF records, the North Dakota commercial real estate community is also relatively compact. Though there are very likely exceptions and outliers, it at least appears that most of the state's real estate investment community is no more than one step removed from at least one—if not many more—of the EPIC Companies. If representation of any parties in interest in the EPIC Companies bankruptcies is, in turn, disqualifying of representing debtors in other real estate-centric Chapter 11 cases, it would seem the pool of local debtor-side reorganizational attorneys may be quickly exhausted.

To be sure, this Honorable Court has an open bar and any attorney, from any state, can become admitted for purposes of filing a chapter 11 case in North Dakota. This Honorable Court also makes it exceedingly easy for out-of-state attorneys to practice in Fargo, with a friendly policy on remote appearances and a readily-navigable set of Local Rules. But there is still some virtue—intangible as it may be—in a debtor being represented by an attorney familiar with a given court and the community in which that court is situated. And there is, too, an economic synergy in using the services of an attorney who does not need to expend hours reviewing local procedures for the first time, who has relationships with the local creditor bar, who has some functional understanding of how hearings normatively proceed in a given court, and who is ultimately reputationally reliant on her or his standing in the local insolvency community.

All of which is to posit that disqualifying DBF herein would create a problematic precedent as the local real estate economy appears primed for the filing of numerous chapter 11 cases. The use of conflicts counsel is designed to avoid just such a situation, even in markets with far larger chapter 11 bars. It would a disservice to deny local businesses the benefit of attorneys with

15

enduring ties to a given court. Where, as here, putative conflicts can be avoided through the use of conflicts counsel, such is ultimately to the benefit of not merely debtors but, too, the estates to which they owe fiduciary duties.

## IV.    Conclusion

WHEREFORE, CAPEX respectfully prays this Honorable Court (i) deny the Motion; and (ii) afford such other and further relief as may be just and proper.

Respectfully Submitted,

Dated: December 2, 2024           By:    /s/ Maurice B. VerStandig
                                         Maurice B. VerStandig, Esq.
                                         The Dakota Bankruptcy Firm
                                         1630 1st Avenue N
                                         Suite B PMB 24
                                         Fargo, North Dakota 58102-4246
                                         Phone: (701) 394-3215
                                         mac@dakotabankruptcy.com
                                         *Counsel for the Debtor*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of December, 2024, a copy of the foregoing was served electronically upon filing via the ECF system.

/s/ Maurice B. VerStandig
Maurice B. VerStandig