IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 24-30422 |
| | ) | (Chapter 11) |
| JAMIESON CAPEX FUND, LLC. | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

**OPPOSITION TO MOTION TO CONVERT CHAPTER 11 CASE
OR IN THE ALTERNATIVE, MOTION TO REPLACE THE DEBTOR IN
POSSESSION AND EXPAND THE SUBCHAPTER V TRUSTEE'S POWERS**

Comes now Jamieson CAPEX Fund, LLC ("CAPEX" or the "Debtor"), by and through undersigned counsel, in opposition to the Motion to Convert Chapter 11 Case or in the Alternative, Motion to Replace the Debtor in Possession and Expand the Subchapter V Trustee's Powers (the "Motion," as found at DE #44) filed by the United States Trustee (the "UST"), and states as follows:

**I.      Introduction**

While perhaps less common in small business filings, this is not the first—and assuredly will not be the last—chapter 11 case in which a debtor owes money to, and is owed monies by, affiliated companies. Under governing law, CAPEX's current president, Jeremy Carlson ("Mr. Carlson"), is nonetheless permitted to remain at the helm of the entity, and CAPEX is nonetheless permitted to remain in possession of its own bankruptcy estate, so long as potential conflicts are managed in a holistic fashion that preserves the interests of creditors. Nonetheless, in effort to ensure this case not be sidetracked by even suspicions of illicit motivations, the Debtor has filed an application to employ a third party fiduciary, with unimpeachable ethos, as chief restructuring officer ("CRO"). And the Debtor has, too, proposed a plan of reorganization (the "Plan," as found

1

at DE #37) that assures all parties in interest of either (i) payment in full; or (ii) the careful liquidation of the Debtor's assets in a manner designed to maximize value.

At core, the Motion warrants denial because the relief sought therein is premised upon "cause," and no such "cause" exists herein. The UST posits the existence of a conflict between Mr. Carlson's interests and the estate's interests; however, (i) such a conflict is permissible if properly managed, and (ii) any potential conflict has been wholly mitigated through the engagement of a CRO who is a fully disinterested fiduciary. The UST further posits a substantial and continuing diminution of the estate and an absence of a reasonable likelihood of reorganization. Yet, (i) the unbilled fees of the Debtor's counsel, as of this filing, only marginally exceed the retainer being held; (ii) the professional fees, in this case, remain far below the threshold of substantiality established by case law; and (iii) there is a strong likelihood of reorganization insofar as the Plan has been filed, served, and scheduled for a confirmation hearing. Finally, the UST posits—albeit in a single sentence—that "cause" exists due to a failure to produce requested documents. However, the Debtor has filed and produced all required small business documents, and it remains unclear what additional documentation the UST believes has been reasonably requested but not provided.

More broadly, this case has been pending for barely two and a half months, during which time CAPEX has (i) twice attended a meeting of creditors; (ii) produced myriad documents; (iii) promptly established a mechanism to employ conflicts counsel as soon as concerns were raised by the UST; (iv) engaged the CRO shortly thereafter; (v) commenced litigation to recover significant monies; and (vi) filed the Plan, providing for either the payment of all allowed claims in full or the orderly wind up of the Debtor's operations in a manner that will maximize liquidation values for creditors. The Debtor may not be perfect (few entities seeking chapter 11 relief bask in the justified

2

aura of perfection), at least one creditor may be rather unhappy that the Bankruptcy Code allows for reorganization in the first place (creditors frustrated by the automatic stay rarely find glee in bankruptcy proceedings), and at least one litigation counterparty seems to particularly despise the Debtor (summonses are scantly as well received as birthday cards). Nevertheless, the Debtor has pursued a strategic, methodical reorganization, and has moved with relative expediency to dispel operational concerns and share a lucid path forward.

For these reasons, and as extrapolated upon *infra*, it is respectfully urged the Motion be denied.

## II.    Argument: The Motion Should be Denied

### a.    There is No Cause to Dispossess the Debtor

In seeking to place the subchapter V trustee, Thomas Kapusta ("Mr. Kapusta"), in possession, the UST points to alleged conflicts of interest between Mr. Carlson and the Debtor. The gravamen of this argument appears to be that Mr. Carlson hold an interest in—and formerly established and/or operated—various transactional counterparties and, ergo, is illicitly motivated to advance his derivative interests whilst helming the Debtor through chapter 11. Such a contention is misplaced; the UST does not point to any post-petition action—or inaction—of Mr. Carlson that is suggestive of impure motivations or interests not fully aligned with the creditor base herein. But the contention is, too, immaterial: CAPEX has now moved to employ Michael Schmitz ("Ms. Schmitz"), a wholly disinterested third-party fiduciary (and the current mayor of Bismarck) as CRO. Even if an issue were extant prior to the engagement of Mr. Schmitz, such has now been resolved.

The traditional mechanism for appointment of a chapter 11 trustee is inapplicable in cases under subchapter V. *See* 7 Collier on Bankruptcy P 1112.04 ("Section 1104 does not apply in cases

3

under subchapter V.") (citing 11 U.S.C. § 1181(a)). The Bankruptcy Code does, however, provide an analogous—albeit not purely identical—provision through which a subchapter V trustee may be placed in possession of a debtor:

> On request of a party in interest, and after notice and a hearing, the court shall order that the debtor shall not be a debtor in possession for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, either before or after the date of commencement of the case, or for failure to perform the obligations of the debtor under a plan confirmed under this subchapter. . .

11 U.S.C. § 1185(a).

This statutory language importantly differs from that of Section 1104, insofar as "the focus of a court's determination of cause under section 1185(a) is on improper conduct of the debtor in possession and does not include the interests of creditors, equity security holders or other interests of the estate." 8 Collier on Bankruptcy P 1185.01. Or, stated otherwise, a trustee ought not be appointed in a subchapter V case merely because creditors believe—or even can show—that such might be in their best interests.

This limitation is consistent with broader policy concerns that touch all chapter 11 cases, insofar as "[t]he appointment of a trustee in a Chapter 11 case is an extraordinary remedy. And, 'there is a strong presumption in favor of allowing a chapter 11 debtor-in-possession to remain in possession.'" *Keeley & Grabanski Land P'ship v. Keeley (In re Keeley & Grabanski Land P'ship)*, 455 B.R. 153, 162 (B.A.P. 8th Cir. 2011) (citing *In re Veblen West Dairy LLP*, 434 B.R. 550, 553 (Bankr. D. S.D. 2010) (citing *Adams v. Marwil (In re Bayou Group, LLC)*, 564 F.3d 541, 546 (2d Cir. 2009); *In re AG Service Centers, L.C.*, 239 B.R. 545, 550 (Bankr. W.D. Mo. 1999)); quoting *Veblen W. Dairy LLP*, 434 B.R. at 553 (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 577 (3rd Cir. 2003); *Ag Service Centers, L.C.*, 239 B.R. at 550)).

4

While the existence of conflicts of interest may be grounds upon which to place a subchapter V trustee in possession, *In re Duling Sons, Inc.*, 650 B.R. 578, 581 (Bankr. D.S.D. 2023), "[a] court may decline to remove a debtor based on a conflict of interest, however, if the debtor is properly managing the conflict," 8 Collier on Bankruptcy P 1185.01 (citing *In re Neosho Concrete Products Co.*, 2021 Bankr. LEXIS 1198 (Bankr. W.D. Mo. 2021)). *See also In re Edgewood Food Mart, Inc.*, 2024 Bankr. LEXIS 2712, at *25-26 (Bankr. N.D. Ga. Nov. 6, 2024) ("Ordinarily, if such an extensive conflict exists, the remedy is to remove the debtor as debtor in possession or conversion to Chapter 7. Here, unlike Fiesta Homes of Georgia, the Plan provides meaningful distributions to creditors that do not depend upon the proceeds of any potential suit by Debtor against Mr. Panjwani for breach of fiduciary duty. This is not a case where a debtor's failure to pursue a cause of action requires a finding that the plan was not proposed in good faith.").

In this case, to whatever extent Mr. Carlson may suffer a conflict on account of his pecuniary ties, such has been properly managed through the crafting of the Plan, which calls for either (i) the payment of all creditors in full or (ii) the liquidation of the Debtor. There is no indication that Mr. Carlson is pursuing—or refraining from pursuing—specific actions based on self-intrest. To the contrary, the record shows Mr. Carlson has been helming the Debtor, on a *gratis* basis, out of only an abiding interest in seeing liabilities cleared and equity holders placed in as advantageous an economic position as possible.

Whether or not Mr. Carlson has a conflict is also immaterial, as the Debtor has now sought to employ Mr. Schmitz as CRO. Mr. Schmitz is a third-party fiduciary with sterling credentials and an impeccable reputation. He does not hold any interests adverse to the Debtor and he is not financially motivated by the disposition, *vel non*, of any of the Debtor's assets (including litigation

5

rights). The CRO is solely charged with administering CAPEX in a manner consistent with the objectives of the Bankruptcy Code, abiding by the duty owed to creditors and parties in interest.

So even if a conflict were present, the Debtor's actions would constitute management of the conflict in a manner that militates against placing the subchapter V trustee in possession. The Plan achieves this goal unto itself, being consistent with case law allowing conflicts to not be meritorious of dispossession if plans of reorganization provide for the proper payment of creditor claims, and the appointment of a CRO furnishes further independent evidence of the Debtor properly managing any conflicts (whether they be actual, potential, perceived, or illusory).

### b. There is No Cause to Convert

The Motion's contentions in support of conversion are more peculiar in nature, being seemingly reliant upon either (i) the foregoing assertion of a conflicted debtor-in-possession; or (ii) an ongoing diminution of CAPEX's estate without a reasonable likelihood of reorganization. The former contention is addressed *supra* and proves unsuccessful in light of the Plan's allowances and the CRO's engagement. The latter contention is not supported by the record herein.

Familiarly, the Bankruptcy Code does allow for a chapter 11 case to be converted (or dismissed) where there is "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation. . ." 11 U.S.C. § 1112(b)(4)(A). Such relief is improper, however, where (i) unusual circumstances envelope a case; (ii) there exists a reasonable likelihood of plan confirmation; and (iii) a debtor has cured—or is likely to cure—the underlying issue. 11 U.S.C. § 1112(b)(2).

Here, there is neither a "substantial or continuing loss to or diminution of the estate" nor an absence of a "reasonable likelihood of rehabilitation" of the Debtor. The Debtor's only ongoing economic obligations post-petition have been professional fees, which, as of now, are only slightly higher than the pre-petition retainer being held (and that is without time entries being reviewed for

markdowns). Moreover, a significant portion of those fees (albeit not the majority) have been incurred responding to filings urging dispossession of the Debtor and/or disqualification of counsel, which certainly begets a level of irony—if not an argument of estoppel—in assessing the ongoing administrative expenses of this case.

The UST relies on a Minnesota case in support of the notion that "[a] finding of accruing chapter 11 administrative costs is sufficient to find negative cash flow." Motion, DE #44, at p. 8 (citing *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004)). However, *Loop Corp.* involved a bankruptcy estate that incurred over $1.3 million in professional fees within a two-month period. *Loop Corp. v. United States Tr.*, 290 B.R. 108, 110 (D. Minn. 2003). By contrast, CAPEX's post-petition administrative obligations—excluding the fees being incurred by Mr. Kapusta—appear to be closer to the range of $13,000.00, a figure that is roughly 1% of those in the *Loop Corp* case.

The UST also relies on *Duling Sons* from South Dakota (cited *supra*). Yet that was a case that had "been pending for 16 months," where "[a]dministrative expenses and interest due to an oversecured lender [were] accruing and pose[d] a threat to the administrative solvency of the case." *Duling Sons*, 650 B.R. at 581. This case, by contrast, has been pending for roughly 10 weeks, with no secured creditors whatsoever, and with no extant indication that administrative solvency is jeopardized.

To be sure, every chapter 11 case (exception, theoretically, one handled *pro bono*) involves the ongoing incursion of administrative expense obligations. Counsel will always incur fees and, in subchapter V, the trustee will, too, always incur fees. Yet those fees are ultimately subject to judicial approval for good reason and can be denied if not reasonable and necessary to the administrative of a chapter 11 estate. Holding, as the UST seemingly intimates, that such fees and

7

expenses may *per se* constitute an ongoing diminution sufficient to constitute Section 1112 "cause" would be antithetical to the reorganization process.

Equally, however, Congress imbued in this particular statutory clause a requirement that there be not merely an ongoing diminution but, too, "the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(2)(A). And, in this context, "[r]ehabilitation means confirmation of a feasible plan of reorganization." *In re Featherworks Corp.*, 45 B.R. 455, 457 (Bankr. E.D.N.Y. 1984).

The Debtor has every confidence the Plan in this case will be confirmed. As in most subchapter V proceedings, some amendments may follow the input of parties in interest, as a hearing on confirmation nears. 11 U.S.C. § 1193. At its core, however, the Plan is both imminently fair and equitable in nature, proposing the pursuit of *sui generis* litigation claims (alongside some less novel litigation claims) in conjunction with ongoing operations. Should these efforts fail to furnish sufficient funds to pay allowed claims in full, the Plan provides for an orderly liquidation. The Plan is, no doubt, "feasible" in nature. And there thusly cannot be cause under Section 1112(b)(2)(A) insofar as even if administrative fees could constitute an ongoing diminution, the rigor is conjunctive in nature and defeated by the presence of a feasible plan.

This leaves only the final argument of the UST, which centers on "cause" being established through a failure to furnish documents. The Debtor believes it has turned over all requested documents in the possession, custody and control of CAPEX. And the Debtor has, too, docketed the documents called for in Section 1187 of the Bankruptcy Code. If any items remain outstanding, however, and are available to the Debtor, they certainly can—and will—be produced. To th extent the UST points to tax returns for 2020 through 2022, such are attached hereto as Exhibits A, B, and C. Insofar as a tardy production of documents is *not* cause under Section 1112, *In re Franmar,*

8

*Inc.*, 361 B.R. 170, 179 (Bankr. D. Colo. 2006), it is not reasonably believed disposition of the Motion is likely to turn on this argument (which, as noted above, is but a single sentence of the UST's filing).

Macroscopically, this is a slightly unorthodox case that has been visited by certain eccentricities, but CAPEX is moving through chapter 11 with a delicate blend of care and expediency. The bankruptcy process opens unique doors to the Debtor, allowing an effort to have withheld monies turned over for the benefit of creditors and bypassing the constraints of sovereign immunity where the party holding those funds is a state actor. This is why CAPEX filed a chapter 11 petition in the first place and this is one of many reasons why CAPEX believes all parties in interest are best served through the entity continuing to pursue confirmation of the Plan and a fruitful reorganization.

### III.   Conclusion

WHEREFORE, CAPEX respectfully prays this Honorable Court (i) deny the Motion; and (ii) afford such other and further relief as may be just and proper.

                                          Respectfully Submitted,

Dated: December 13, 2024        By:    /s/ Maurice B. VerStandig
                                                    Maurice B. VerStandig, Esq.
                                                    The Dakota Bankruptcy Firm
                                                    1630 1st Avenue N
                                                    Suite B PMB 24
                                                    Fargo, North Dakota 58102-4246
                                                    Phone: (701) 394-3215
                                                    mac@dakotabankruptcy.com
                                                    *Counsel for the Debtor*

*[Certificate of Service on Following Page]*

9

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of December, 2024, a copy of the foregoing was served electronically upon filing via the ECF system.

/s/ Maurice B. VerStandig
Maurice B. VerStandig
