IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 24-30422 |
| | ) | (Chapter 11) |
| JAMIESON CAPEX FUND, LLC | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**JAMIESON CAPEX FUND, LLC'S FIRST
AMENDED SUBCHAPTER V PLAN OF REORGANIZATION**

Comes now Jamieson CAPEX Fund, LLC ("CAPEX" or the "Debtor"), by and through undersigned counsel, pursuant to the rigors of Official Form 425A and Section 1193 of Title 11 of the United States Code, and provides the following amended plan of reorganization (the "Plan") herein:

### Background for Cases Filed Under Subchapter V

a. **Description and History of the Debtor's Business**

Upon being acquitted by a Bronx County jury in 1987, former Secretary of Labor Raymond Donovan famously asked, "Which office do I go to to get my reputation back?"

This is the court to which CAPEX has gone to get its name—and, more importantly, money—back. Pursued by the North Dakota Securities Department (the "NDSD") over colorful allegations involving Ponzi-esque behavior and fraud, the Debtor ultimately entered into a consent decree with the state whereby some paperwork would be remedied and business would carry on as usual. But the harm had been done, with reputations tattered in the North Dakota investment community and flashy headlines of alleged felonious mischief ultimately proving far more indelible than the scantly-noticed order by which the whole saga came to an end.

CAPEX now seeks to formally reorganize, through the provisions of this Plan. NDSD, remarkably and in a nod to unabashed governmental chutzpah, is still holding more than $600k of monies belonging to the Debtor. Counterfactual allegations continue to resonate in the community—and, indeed, even on the docket of this case—despite CAPEX having been cleared of everything but ministerial error. And investments lost during an ill-fated investigation continue to exact an altogether predictable toll on the fund's creditors and equity holders.

To be sure, CAPEX is just that: a fund. While the Debtor meets every statutory rigor of being a small business, and is thusly well suited to avail itself of the remedies provided for in Subchapter V of Chapter 11 of Title 11 of the United States Code, CAPEX most certainly does not resemble a brick-and-mortar shopkeeper or even a neighborhood restauranter. Formed as a North Dakota limited liability company on April 21, 2015, the Debtor has always operated as a diversified real estate investment vehicle, pooling monies to be used to (i) acquire and develop hard assets; (ii) invest in intermediary entities that own and develop hard assets; and (iii) make loans to others in the real estate investment community.

1

The historic arc of these investments was utterly ordinary until mid-2022. Some capital placements proved promising while others were perhaps less inviting with the aid of hindsight. The Debtor accepted monies only from accredited investors and, as such, typical fluctuations were well absorbed. But CAPEX's principal, Jeremy Carlson ("Mr. Carlson") then became a target of the aforementioned governmental inquiry, with myriad proverbial shots seemingly being fired before meaningful questions could actually be asked and answered. The toll on CAPEX was severe, as the fund not only found itself seemingly radioactive in a tightknit community but, too, NDSD commandeered monies due and owing to the Debtor.

Without the ability to collect monies owed by third parties, CAPEX, not surprisingly, became unable to pay its own debts as they came due. At least two of the entity's real estate holdings were lost to foreclosure, with no funds being available to redeem the properties. And one of those assets—a marquee investment in Grand Forks—was taken by a bank despite CAPEX having managed to procure an arm's length, third party buyer prepared to pay approximately $1 million over and above secured debt to acquire the property.

This case was thusly filed on September 22, 2024 with the open and transparent aim of using tools uniquely available under Title 11 of the United States Code (the "Bankruptcy Code") to recover monies due and owing to CAPEX, to be distributed to creditors. Since filing, the Debtor has docketed two adversary proceedings, one being an anticipated effort to reclaim monies held by NDSD and to seek damages from the state for diverting CAPEX's funds, and the other being a more pedestrian suit to remedy a particularly egregious post-petition violation of the automatic stay by an aggressive creditor. As set forth herein, at least one more adversary proceeding will be forthcoming, with designs of using the litigation process to remedy as much of the harms suffered by CAPEX as possible.

b. **Liquidation Analysis & Secured Claim Valuation**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a Chapter 7 liquidation. The Debtor entered bankruptcy with $8,172,488.21 in assets (though it appears slightly over $600k in assets may have been double-counted, being both noted as accounts receivable and the foundation of litigation rights against NDSD) and $3,122,538.90 in putative liabilities (of which at least $300k is disputed).[1]

Through this Plan, the Debtor will pay 100% of allowed claims, thereby ensuring creditors receive at least as much as they would in a Chapter 7 liquidation. CAPEX will also be able to pay creditors more efficiently through the ongoing operations contemplated in this Plan, than creditors could be paid under a liquidation, in light of the enormously illiquid nature of the majority of the Debtor's assets. Interests in closely held third party investment vehicles are innately illiquid in nature, just as are the litigation rights belonging to the Debtor. By holding these interests and collecting returns thereupon, or waiting until appropriate market circumstances allow a sensible sale of these interests, CAPEX will be able to maximize a return to both creditors and equity holders. Subjecting these interests to a fire sale would risk paying creditors less than 100 cents on the dollar, would risk a wholesale erosion of equity interests held by investors, and would only

---

[1] The Debtor is presently assessing whether or not there exists a good faith basis to dispute additional claimed liabilities and necessarily reserves its right to do so in accord with the provisions of the Bankruptcy Code and this Plan.

2

serve to enrich a trustee through the payment of a commission and the collection of presumptively-hefty attorneys' fees.

### c. Ability to Make Future Plan Payments and Operate Without Further Reorganization

The Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments. There is innate peril in projecting the forward-looking returns to be realized from closely held real estate investments and the liquidation of litigation rights, especially in an economic atmosphere where the commercial real estate market in North Dakota faces historically unique pressures.

This Plan is designed, however, to ensure the Debtor expend no monies, saving and excepting (a) fees paid to professionals to ensure CAPEX remain compliant with securities laws; (b) taxes due and owing to government authorities; (c) professional fees occasioned by the express terms of this Plan; and (d) commissions due and owing to brokers, where contextually appropriate. This Plan is also structured to provide for the liquidation of the Debtor to the extent monies are not otherwise made available to pay the claims of creditors.

These safeguards collectively create a construct whereby further reorganization will not be necessary. To the extent the Debtor is not successful in making targeted payments hereunder, a methodical liquidation will ensue pursuant to the terms of this Plan. Either scenario necessarily prevents a subsequent petition for bankruptcy relief.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1.     Summary**

This Plan under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") proposes to pay creditors of the Debtor from the general cash flow of the Debtor.

The Plan provides for:     1 class of unsecured claims; and

1 class of equity holders.

The Plan also provides for the payment of administrative priority claims other than those placed in classes.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2.     Classification of Claims and Interests**

**Section 2.01   Class 1**          All general unsecured claims.

**Section 2.02   Class 2**          The Debtor's equity interests.

3

**Article 3.** **Treatment of Administrative Expense Claims and Court Costs**

**Section 3.01** **Unclassified Claims** — Under § 1123(a)(1) of the Bankruptcy Code, certain administrative expense claims are not in classes.

**Section 3.02** **Administrative Expense Claims** — Pursuant to Section 1191(e) of the Bankruptcy Code, holders of allowed administrative claims will be paid (i) first, out of retainers they are holding at the time their respective fees are approved by this Honorable Court; and (ii) second, out of the proceeds of litigation provided for herein, with all such payments to be made during the life of this Plan.

**Section 3.03** **Priority Tax Claims** — Each holder of a priority tax claim will be paid in full not later than September 21, 2029. It is not, however, believed any such claims exist.

**Section 3.04** **Statutory Fees** — There are no statutory fees due in this case.

**Section 3.05** **Prospective Quarterly Fees** — There are no prospective quarterly fees that will be due in this case.

**Article 4.** **Treatment of Claims and Interest Under the Plan**

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 – General Unsecured Creditors | Impaired | Class 1 consists of all allowed creditor claims not provided for in Article III hereof. |
| Class 2 – Equity Interests | Unimpaired | The equity holders of the Debtor shall retain their respective equity interests in the Debtor on the Effective Date, though each such holder shall be free to sell said equity interests at any time thereafter so long as such sale does not offend governing law or the Debtor's operating agreement as it may exist on the date of such sale(s). |

**Article 5.** **Allowance and Disallowance of Claims**

**Section 5.01 Disputed Claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which either: (i) a proof of claim has been filed or deemed filed, and the

4

Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**Section 5.02   Delay of Distribution of Disputed Claims.** No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order.

**Section 5.03   Settlement of Disputed Claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Section 5.04   Time to Dispute Claims**. The Debtor anticipates objecting to at least one claim in this case. Any such claim objection must be filed by the Debtor within six months from the effective date of this Plan (as defined in Section 8.02 hereof), *except* any objection to the claim of any governmental tax creditor may be filed at any time within six months of the date on which such claim is filed.

**Article 6.        Provisions for Executory Contracts and Unexpired Leases**

**Section 6.01   Assumption.** The Debtor assumes any investment contracts to which CAPEX may be a party, including the operating agreements of any entity in which CAPEX may hold an interest, together with any other executory contracts entered into pursuant to—or in accord with—the making of third party investments by CAPEX. It is not believed that operating agreements constitute executory contracts, for purposes of relevant bankruptcy law, or that any other such contracts are extant in nature, but this assumption is nonetheless provided for in an abundance of caution.

**Section 6.02   Cure Payments.** Upon diligent inquiry, it does not appear any cure payments are due and owing, insofar as it does not appear any executory contracts or unexpired leases are extant in this case.

**Section 6.03   Rejection.** The Debtor rejects all executory contracts and unexpired leases not assumed in Section 6.01 hereof.

**Article 7.        Means for Implementation of the Plan**

**Section 7.01   Litigation**

The Debtor has filed an adversary proceeding against Karen J. Tyler, in her official capacity as the Securities Commissioner of the North Dakota Department of Securities ("Sec. Tyler") and the State of North Dakota. *See Jamieson CAPEX Fund, LLC v. Tyler, et al.*, Case No. 24-07030 (Bankr. D.N.D. 2024) (the "NDSD Litigation"). The Debtor has also filed a suit against Jeff Johnson for violating the automatic stay set forth in Section 362 of the Bankruptcy Code. *See Jamieson CAPEX Fund, LLC v. Johnson*, Case No. 24-07028 (Bankr. D.N.D. 2024) (the "Johnson Litigation"). And the Debtor reasonably anticipates also filing an adversary proceeding against First International Bank & Trust (the "FIBT Litigation") in the coming weeks. These litigation assets, together with any others that may be identified and pursued by CAPEX, are reasonably expected to furnish monies that may be used to pay the claims of creditors herein.

The Debtor will continue to pursue these litigation claims post-confirmation (to the extent the subject cases are not resolved pre-confirmation). Pursuit of these matters will be to and through the collection of any judgments occasioned thereby. Upon collection of monies, funds will be used (i) first, to fund the Debtor's continued operations through the payment of taxes and professional fees and commissions; (ii) second, to fund Section 7.03 of this Plan; (iii) third, to pay any outstanding administrative expense claims; and (iv) fourth, to pay the claims of Class 1 creditors. If, and only if, monies exceed all allowed Class 1 claims herein, funds will then be applied to the Debtor's ordinary operations, either being invested in accord with the business judgment of CAPEX or distributed to equity holders. For purposes of this Article 7 (including subparts below), "invested" shall be defined to include holding cash reserves where appropriate in the Debtor's business judgment.

**Section 7.02   Continued Operation of the Fund**

The Debtor holds myriad investments in both equity and debt. Post-confirmation, CAPEX will continue to collect monies from these investments as feasible and advisable in nature. As noted *supra*, these investments are almost uniformly illiquid in nature, and the North Dakota commercial real estate economy is presently a tumultuous environment, so the Debtor is expressly not projecting any definable proceeds to be realized under this Section 7.02. But to the extent monies are paid to the Debtor, either through the collection of debt or the receipt of equity distributions, such monies will be used (i) first, to fund the Debtor's continued operations through the payment of taxes and professional fees and commissions; (ii) second, to pay any outstanding administrative expense claims; and (iii) third, to pay the claims of Class 1 creditors. If, and only if, monies exceed all allowed Class 1 claims herein, funds will then be applied to the Debtor's ordinary operations, either being invested in accord with the business judgment of CAPEX or distributed to equity holders.

**Section 7.03   Special Counsel**

The United States Trustee (the "UST") has suggested the Debtor may hold one or more claims against a separate client of CAPEX's general reorganization counsel or one or more entities owned in part by a separate client of CAPEX's general reorganization counsel. At such time as the funds made available under Section 7.01 hereof exceed Twenty Five Thousand Dollars and No Cents ($25,000.00), the Debtor will engage outside special counsel, through the payment of a retainer in that sum, to represent the Debtor in connection with the pursuit of any claims against any client of CAPEX's general reorganization counsel. The fees of special counsel, over and above that retainer, shall be construed as administrative expense obligations for purposes of this Plan.

The Debtor has commenced assessing who may serve as special counsel in this case and will identify the selected candidate prior to a confirmation hearing, through a supplemental filing on the docket of this case. In light of the nature of the alleged conflict suggested by the UST, it is reasonably believed no North Dakota law firm with experience handling Chapter 11 cases will be able to serve as special counsel and the Debtor will need to engage counsel from another jurisdiction. The Debtor's present inclination is to engage counsel from a mid-sized Midwestern

6

city, with extensive bankruptcy experience, whose dealings in this Honorable Court have been notably limited, though the Debtor will continue to assess various options.

Should the Debtor, in consultation with special counsel, conclude there either (i) are no claims to be pursued against clients of CAPEX's general reorganization counsel; or (ii) pursuit of such claims would not be economically advisable in light of the legal fees and costs to be occasioned thereby, any unused portion of the retainer being held by special counsel will be distributed (i) first, to fund the Debtor's continued operations through the payment of taxes and professional fees and commissions; (ii) second, to pay any outstanding administrative expense claims; and (iii) third, to pay the claims of Class 1 creditors. If, and only if, monies exceed all allowed Class 1 claims herein, funds will then be applied to the Debtor's ordinary operations, either being invested in accord with the business judgment of CAPEX or distributed to equity holders.

Should the Debtor, in consultation with special counsel, elect to pursue any litigation claims, the proceeds thereof will be distributed (i) first, to fund the Debtor's continued operations through the payment of taxes and professional fees and commissions; (ii) second, to pay any outstanding administrative expense claims; and (iii) third, to pay the claims of Class 1 creditors. If, and only if, monies exceed all allowed Class 1 claims herein, funds will then be applied to the Debtor's ordinary operations, either being invested in accord with the business judgment of CAPEX or distributed to equity holders.

**Section 7.04   Liquidation**

Should all Class 1 claims not be paid in full on or before the third anniversary of the effective date of this Plan, the Debtor will undertake to liquidate all remaining assets through the sale of equities and debt instruments to third parties. So as to avoid incurring losses arising from a fire sale, and in light of this deadline being made public in this Plan, the Debtor will undertake such liquidation through best efforts and as appropriate in the business judgment of CAPEX. Liquidation efforts shall cease once all Class 1 claims are paid in full. Should all Class 1 claims not be first paid in full, the Debtor will assign all remaining assets to the Subchapter V trustee, to be liquidated in his business judgment, on the last business day preceding the fifth anniversary of the effective date of this Plan. Upon payment of all Class 1 claims in full, the Subchapter V trustee shall cease liquidating the Debtor's estate and return all remaining assets to the Debtor.

**Article 8.   General Provisions**

**Section 8.01   Definitions and Rules of Construction.** The definitions and rules of construction set forth in §§ 101-02 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

**Section 8.02   Effective Date.** The effective date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated.

**Section 8.03   Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**Section 8.04   Binding Effect.** The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors, assigns and/or receiver(s) of such entity.

**Section 8.05   Default.** Should there occur a default under this Plan, creditors will have all rights provided for in the Bankruptcy Code (including Section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under Chapter 7 of the Bankruptcy Code) as well as the right to seek recourse for breach of contract together with such remedies as this Honorable Court may deem just and proper, sitting as a court of equity; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest. A default shall also be deemed to occur if the Debtor materially violates any substantive provision of this Plan.

**Section 8.06   Disbursing Agent.** There shall be no disbursing agent hereunder and the Debtor will make all payments to creditors directly, by check or, where available, direct deposit or auto-debit.

**Section 8.07   Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**Section 8.08   Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of North Dakota govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**Section 8.09   Escheat.** If any distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder. Unclaimed property shall be (i) first paid to other members of the class of the claimant not claiming said distribution, until such a time as said class is paid in full; (ii) second paid to each junior class, until all classes are paid in full (though it is recognized this Plan only provides for one creditor class); and (iii) then, if and when each class is paid in full, remaining funds shall be donated to the University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond, Esq. in the charitable manner she sees most fit. The University of Miami School of Law Bankruptcy Clinic works with members of the South Florida legal community to provide *pro bono* services to persons in need of bankruptcy relief, while also furnishing law students with valuable pedagogical experience in the field of bankruptcy law.

**Section 8.10   Retention of Jurisdiction.** The United States Bankruptcy Court for the District of North Dakota shall retain jurisdiction of this Chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of

professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

**Section 8.11   Modifications.** Modification of this Plan shall be governed by Section 1193 of the Bankruptcy Code.

**Section 8.12   Professional Fees.** Per Section 3.02 of this Plan, the Debtor must seek the approval of this Honorable Court prior to paying any professional fees incurred during the pendency of this case. Commencing on the Effective Date, however, the Debtor shall be free to pay any post-confirmation fees incurred by ~~the Subchapter V trustee,~~ counsel, or other professionals, without first obtaining leave of court, and such professionals shall thereafter be excused from any requirement to seek leave of court. <span style="color:red">The Subchapter V trustee shall continue to seek Court approval of all fees post-confirmation.</span>

**Article 9.   Discharge**

**Section 9.01   Discharge.** The Court shall grant the Debtor a discharge pursuant to 11 U.S.C. § 1192 of all debts that arose prior to the Petition Date in this case, except any debt (1) on which the last payment is due after the first five (5) years of the Plan; and (2) debts of the kind specified in Section 523(a) of the Bankruptcy Code.

(a) If the Plan is confirmed under 11 U.S.C. § 1191 as a consensual plan, the Debtor shall receive a discharge on the effective date of the Plan; or

(b) If the Plan is confirmed under 11 U.S.C. § 1191(b), the Bankruptcy Court shall grant a discharge upon the completion of the plan payments being made in June 2029.

**Section 9.02   Effect of Discharge.** This discharge will be effective against all creditors of the Debtor given notice of this bankruptcy case and sent a copy of this Plan, together with their respective members, managers, insiders, shareholders, officers, directors, trustees and receivers.

**Article 10.   Retention of Certain Assets; Notice of Substantial Consummation**

**Section 10.01** Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, all litigation claims (including, but not limited to, rights arising under Chapter 5 of the Bankruptcy Code) shall remain an asset of the Debtor's bankruptcy estate—and shall, accordingly, remain subject to the protections of Section 362(c)(1) of the Bankruptcy Code—to and through January 1, 2029, at which time said interest (should any remain) shall revest in the Debtor.

**Section 10.02**  If the Plan is confirmed under 11 U.S.C. § 1191(a), the Debtor will file a Notice of Substantial Consummation not later than 14 days after the Plan is substantially consummated per 11 U.S.C. § 1183(c)(2).

                    Respectfully Submitted,

                    /s/ Maurice B. VerStandig
                    Maurice B. VerStandig, Esq.
                    THE DAKOTA BANKRUPTCY FIRM
                    1630 1st Avenue N
                    Suite B PMB 24
                    Fargo, North Dakota 58102-4246
                    mac@dakotabankruptcy.com
                    *Counsel for the Debtor*