IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 24-30422 |
| | ) | (Chapter 11) |
| JAMIESON CAPEX FUND, LLC | ) | |
| | ) | |
| Reorganized Debtor. | ) | |
| _____ | ) | |

**REPLY OF THE DAKOTA BANKRUPTCY FIRM TO OBJECTION
TO FIRST AND FINAL APPLICATION OF JAMIESON CAPEX FUND, LLC
<u>FOR ALLOWANCE OF COMPENSATION OF CHIEF RESTRUCTURING OFFICER</u>**

Maurice B. VerStandig, Esq.
The Dakota Bankruptcy Firm
1630 1ˢᵗ Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
mac@dakotabankruptcy.com
*Counsel for The Dakota Bankruptcy Firm*

*Table of Contents*

I.      Introduction ........................................................................................................... 1

II.     Experiential Scope and Ethical Notation ............................................................. 2

III.    Anecdotal and Data-Driven Observations: Mr. Kapusta's Case Involvement
        is Often Most Discernable in the Form of Efforts to Secure and Collect
        Trustee Fees ......................................................................................................... 3

IV.     The Objection is Without Legal Merit and Undermines Reorganizational
        Principles .............................................................................................................. 7

        a.   The Two Most Concerning Collection Efforts ............................................ 7

        b.   The Problematic Nature of the Objection ................................................... 8

        c.   Mr. Kapusta's Actions are Contra to Subchapter V ............................... 11

V.      Conclusion .......................................................................................................... 17

*Table of Authorities*

**Cases**

*Gen. Elec. Capital Corp. v. Dial Bus. Forms (In Re Dial Bus. Forms, Inc.)*,
283 B.R. 537 (B.A.P. 8th Cir. 2002) ................................................................... 9

*In re 218 Jackson LLC*,
631 B.R. 937 (Bankr. M.D. Fla. 2021) ................................................................ 12

*In re Charterhouse, Inc.*,
84 B.R. 147 (Bankr. D. Minn. 1988) ..................................................................... 9

*In re Corinthian Commc'n, Inc.*,
642 B.R. 224 (Bankr. S.D.N.Y. 2022) ................................................................ 14

*In re Louis*,
2022 WL 2055290 (Bankr. C.D. Ill. June 7, 2022) ............................................. 13

*In re Ozcelebi*,
639 B.R. 365 (Bankr. S.D. Tex. 2022) ................................................................ 12

*In re Twin Pines, LLC*,
2020 WL 5576957 (Bankr. D.N.M. Apr. 30, 2020) ............................................. 13

*Kraft v. Essentia Health*,
2024 WL 4685402 (D.N.D. Oct. 7, 2024) .............................................................. 3

*Lawski v. Frontier Ins. Grp., LLC (In re Frontier Ins. Grp., Inc.)*,
585 B.R. 685 (Bankr. S.D.N.Y. 2018) ................................................................... 9

**Statutes**

11 U.S.C. § 1141 ...................................................................................................... 9

11 U.S.C. § 1183 .................................................................................................... 13

11 U.S.C. § 1191 ................................................................................................. 2, 9

**Rules**

Federal Rule of Bankruptcy Procedure 1020 ........................................................ 13

**Other Authorities**

American Bankruptcy Institute, *Final Report of the American Bankruptcy
Institute Subchapter V Task Force* (2004) ........................................................... 15

*Handbook for Small Business Chapter 11 Subchapter V Trustees*, February 2020 .................... 12

iii

Comes now The VerStandig Law Firm, LLC d/b/a The Dakota Bankruptcy Firm ("DBF"), an administrative creditor herein, by and through undersigned counsel, in reply to the Objection to First and Final Application of Jamieson CAPEX Fund, LLC for Allowance of Compensation of Chief Restructuring Officer (the "Objection," as found at DE #111, with the underlying application being known as the "Fee Application," as found at DE #110) filed by Thomas Kapusta ("Mr. Kapusta"), the Subchapter V trustee herein, and states a follows:

## I.    Introduction

Jamieson CAPEX Fund, LLC ("CAPEX" or the "Reorganized Debtor") is bound, pursuant to the terms of a consensually-confirmed plan of reorganization (the "Plan," as found at DE #88), to pay all administrative creditors with funds realized from any recovery in pending litigation. Not content with this treatment, Mr. Kapusta now objects to approval of the administrative claim of Michael Schmitz ("Mr. Schmitz"), CAPEX's chief restructuring officer ("CRO"), on the premise that Mr. Schmitz's claim ought not be even approved unless and until Mr. Kapusta's own administrative expense claim is paid in full—or, at minimum, that Mr. Kapusta's claim must be paid prior to the CRO's claim. In so doing, the Subchapter V trustee takes a position that is not legally defensible and that appears to be facially antithetical to the Plan, to Congress' plain language, and to the process—and spirit—of small business reorganization.

This brief is filed by DBF, not CAPEX, because the Objection is emblematic of a larger problem that has come to encompass Subchapter V cases in the District of North Dakota. While CAPEX will file a joinder hereto, portions of the discussion *infra* transcend the instant case and are premised upon the non-privileged knowledge and observations of DBF, not CAPEX, derived from several cases. Equally, insofar as DBF is—by far—the largest administrative claim holder in

1

this case, DBF has an independent interest in not seeing the Plan's provisions stymied by the Subchapter V trustee.

Defense of the Plan's design, however, is relatively simple. Section 1191(e) of Title 11 of the United States Code (the "Bankruptcy Code") allows for administrative claimants to be paid during the life of a Subchapter V plan. The Plan in this case expressly invokes such an allowance. And while the underlying law is discussed in marginally greater detail below, the notion that a creditor is not entitled to payment on terms any more expedited or favorable than those provided for in a plan is a well-settled facet of bankruptcy law.

The trickier—and, no doubt, palpably more delicate—issue is idiosyncratic to Mr. Kapusta's services as Subchapter V trustee. With potentially one exception, he has been the sole individual to serve in that capacity, in this Honorable Court, over the last several years. And while the value of his services in this case is not presently relevant (indeed, the order granting his fee application has long-since become final), there is enormous relevance to the manner in which the pecuniary elements of his service as trustee have at least appeared to grow outsized in nature. It is not merely that the predominance of Mr. Kapusta's case-specific communications surround the collection and payment of his fees (whether interim or final); it is, too, that he is now actively endeavoring to hamper the progress of a reorganized debtor that has not heeled to his demands. The Subchapter V trustee has sought to do similarly at least once in the past and has now proceeded to do so a second time. The tactical repetition is equally remarkable and chilling in nature.

## II.    Experiential Scope and Ethical Notation

Since April 2023, there have been approximately twelve cases filed in this Honorable Court under Subchapter V of chapter 11. DBF has had the privilege of representing the debtor in eight of those cases (three of which were jointly administered). Various data points and observations in

2

this brief are drawn from the collective experience of representation in all eight of those cases and are not limited to the reorganization of CAPEX.

For the avoidance of doubt, no privileged material or confidences belonging to any of the eight debtors (including CAPEX) are divulged herein. Conversations between a debtor's counsel and a bankruptcy trustee are, by definition, not protected by the attorney/client privilege. *Kraft v. Essentia Health*, 2024 WL 4685402, 2024 U.S. Dist. LEXIS 204744, at *8 (D.N.D. Oct. 7, 2024). Nonetheless, care has been taken to ensure nothing of an even vaguely sensitive nature is disclosed, even if not technically privileged or confidential.

Similarly, it bears notation that the views and observations expressed *passim* are those of DBF and its principal. While CAPEX does share in the arguments being advanced, as evidenced by CAPEX's joinder, such ought not be construed as being representative of the position of any of the other seven Subchapter V debtors currently or formerly represented by DBF.

### III. Anecdotal and Data-Driven Observations: Mr. Kapusta's Case Involvement is Often Most Discernable in the Form of Efforts to Secure and Collect Trustee Fees

With increasing frequency over the past two years, the most notable participation of Mr. Kapusta, in the cases of DBF's clients in which he serves as trustee, has related to the incursion and collection of fees. Exceptions certainly exist to the foregoing observation, and there is not presently any dispute that Mr. Kapusta has performed the services delineated in fee applications for which compensation has been awarded. But those services, more often than not, are unaccompanied by any substantive interplay with the administration of debtors' estates. In essence, it appears that docketed papers are reviewed, and hearings are attended, often (albeit not always) with no observable or discernable impact upon a correlative debtor's case. And such a passive role would not be alarming but for the abrupt juxtaposition to the enormously active role of Mr. Kapusta

3

in both incurring and collecting fees that often seem little more than a *de facto* tax upon small businesses endeavoring to reorganize in the throes of economic despair.

Between May 2, 2023 and April 17, 2025, Mr. Kapusta sent 165 e-mails to undersigned counsel. Ninety two of those e-mails—roughly 55.7%—have been directly correlative to Mr. Kapusta's efforts to collect trustee fees and/or retainers. The figure is even more alarming when considered in a chronological prism that shows a significant uptick over time, with the figure reaching 86.9% over the past six months.

The first chapter 11 debtor represented by DBF, in this Honorable Court, was Christopher Glenn. *See In re Glenn*, Case No. 23-30132 (Bankr. D.N.D. 2023). Fifty-seven e-mails were sent by Mr. Kapusta, to undersigned counsel, in connection with that case, of which twenty-four—roughly 42.1%—correlated to the collection of trustee fees.

The next three cases were jointly administered, being the since-failed reorganizational efforts of a trio of Mexican restaurants under common control. *See In re Bourbon Street, LLC*, Case No. 23-30246 (Bankr. D.N.D. 2023); *In re Petri Enterprises, LLC*, Case No. 23-30247 (Bankr. D.N.D. 2023); *In re Gannett Peak, LLC*, Case No. 23-30248 (Bankr. D.N.D. 2023). Of the fourteen e-mails topical to those cases, only two— a relatively scant 14.3%—correlated to the collection of trustee fees.

Later in 2023, DBF served as counsel to Drain Services Inc. *See In re Drain Services Inc.*, Case No. 23-30352 (Bankr. D.N.D. 2023). That case fetched forty-one e-mails from Mr. Kapusta to DBF's principal, of which twenty—48.8%—were related to the collection of trustee fees and/or a retainer securing such fees.

The next case concerned a local restaurant franchise operator. *See In re Red River Subs, Inc.*, Case No. 24-30010 (Bankr. D.N.D. 2024). Twenty e-mails were sent by Mr. Kapusta to

4

undersigned counsel in connection with that case, of which seventeen—or 85%—related to the collection of fees and/or a retainer securing such fees.

Subsequently, Stark Energy, Inc. sought to reorganize through Subchapter V. *See In re Stark Energy, Inc.*, Case No. 24-30168 (Bankr. D.N.D. 2024). DBF served as co-counsel in that case, entering an appearance post-petition and largely confining its efforts to a discreet summer period (which, in fairness to Mr. Kapusta, means undersigned counsel was not privy to e-mails dealing with the early stages of the case). Of the twenty-one e-mails sent to undersigned counsel in connection with that case, nineteen—or 90.5%—correlated to the collection of fees and/or a retainer.

In connection with the above-captioned case, there have been sixteen e-mails, of which thirteen—or 81.25%—correlate to the collection of fees and/or a retainer.

Taken together, these numbers reveal that through the three most recent Subchapter V cases—Stark Energy, Red River Subs, and CAPEX—some 86% of Mr. Kapusta's e-mails have related to the collection of trustee fees and/or a retainer. If the numbers are instead examined on a solely calendar-based horizon, counting all e-mails (regardless of case) since January 1, 2024, the fee-related communications have accounted for 77.8% of such e-mails. If the time horizon is shortened to the immediately preceding six months (from November 20, 2024 forward), the figure increases to 86.9%. And the numbers grow even starker upon realization that a large number (albeit

not all) of the non-fee related e-mails simply relate to the scheduling of initial debtor interviews and Section 341 meetings of creditors. [1]

Similar records do not exist for phone calls, though it may be conservatively posited that (i) phone calls have been notably rarer than e-mails; (ii) it is believed that phone calls follow similar percentage trends; and (iii) there have, no doubt, been phone calls in which the payment and collection of trustee fees have *not* been addressed. DBF does not always bill for phone calls with trustees and, as such, does not have records with which to create as reliable a data set for such communications.

To be sure, these numbers have been compiled, and are relayed, not out of any abiding fascination with data collection but, rather, because they represent the best available empirical evidence of a generalized observation that has transformed into a concern: Mr. Kapusta's greatest point of focus in Subchapter V cases, especially over the past year, appears to be the collection of trustee fees. While he has, no doubt, relayed messages from creditors on at least two occasions,

---

[1] Several notes correlative to the data underlying these numbers: (I) In assessing whether an e-mail relates to fees, such has been limited to the fees of Mr. Kapusta—e-mails discussing the claims of third party creditors have not been deemed to be responsive. (II) Certain e-mails have touched upon multiple cases, insofar as various cases have temporally overlapped with one another. As such, the aggregate of e-mails, counted case-by-case, marginally exceeds the actual number of e-mails, in light of the double counting of certain communications. (III) E-mails relating to the collection of a South Dakota sales tax have *not* been counted as concerning Mr. Kapusta's fees. While technically correlative, that tax was a discreet legal issue, well beyond Mr. Kapusta's control, that one debtor elected to challenge via an adversary proceeding. (IV) The count of e-mails includes multiple e-mails in a single chain, including acknowledgements of payment receipt following demands for payment. The numbers have been aggregated to show the juxtaposition of attention given to fee-centric issues to e-mails touching upon other issues (hence the percentages *supra*), not the raw number of e-mails correlative to any single collection effort. (V) One e-mail reviewed did not readily correlate to any one case and did not concern the collection of fees. And, finally, (VI) Mr. Kapusta frequently e-mails undersigned counsel at both his Dakota Bankruptcy Firm e-mail address and an e-mail address correlative to his practice in other states. The numbers contained herein are solely based on e-mails to the Dakota Bankruptcy Firm address, with it being believed a review of the other address would fetch myriad redundancies (essentially twice counting the same e-mail).

and shared in generalized discussions of case aspirations in the early days of each matter, such

efforts are significantly dwarfed by the focus he places on securing payment.

Such would not, in and of itself, be a point of concern. DBF takes pride in having

experience managing chapter 11 cases and being able to effectively counsel clients even in those

cases where a trustee is not serving, so an unobtrusive trustee is often appreciated. Yet two

correlative problems have now fully emerged from this construct. First, the collection efforts have

twice seemingly crossed the threshold from merely being rigorous to being guided by interests at

odds with reorganization. And, second, the fees being charged too often have the feel of a tax for

which no correlatively-valued benefits are in turn bestowed.

### IV. The Objection is Without Legal Merit and Undermines Reorganizational Principles

#### a. The Two Most Concerning Collection Efforts

The first instance of Mr. Kapusta seemingly crossing the threshold from aggressive

collection efforts to improper collection efforts came on January 3, 2024, in connection with the

Drain Services case. Less than a month prior, an interim fee application of Mr. Kapusta had been

approved, allowing $4,730.00 in fees and $375.58 in expense reimbursements. *See In re Drain

Services, Inc.*, Case No. 23-30352 (Bankr. D.N.D. 2023) at DE #98. The underlying application

sought payment of these interim fees and expenses "from Debtor account as such funds become

available without adversely affecting the ability of the Debtor to pay its ongoing expenses and

otherwise perform the obligations of the Debtor as debtor-in-possession. . ." *Id.* at DE #76. Yet

when those fees were not then paid within a few weeks of such approval, Mr. Kapusta wrote to the

debtor's counsel, *inter alia*, "[d]ue to the unpaid administrative expense payment for trustee fees

and expenses, this is to advise I intend to object to the amended plan filed by the Debtor." E-mail of January 3, 2024, attached hereto as Exhibit A.[2]

The instant Objection represents the second instance in which Mr. Kapusta, unhappy that a fee award has not yet been paid, has endeavored to leverage a pending docket event to secure collection—this time without any intervening events. *See, supra,* n. 2. And while there may have been some argument—even if relatively thin in nature—that non-payment in the Drain Services case would portend poorly for plan feasibility, there is no such argument here. Rather, as discussed in greater detail below, Mr. Kapusta is now simply trying to block the approval of another professional's fees, not out of any abiding concern about plan feasibility (indeed, the Plan has been confirmed) but, rather, in an effort to secure premature payment of Mr. Kapusta's own administrative expense claim or, at minimum, ensure priority of his claim's payment over that of a fellow professional.

### b.  The Problematic Nature of the Objection

DBF is the largest administrative creditor in this case, holding an approved claim for $8,657.84. Those fees will be tendered, per the express mandate of the Plan, once the Reorganized Debtor collects funds sufficient to pay administrative claims. CAPEX seeks, similarly, to pay Mr. Schmitz the sum of $1,015.88—a vanishingly small sum for the services of a CRO—"in accord with the confirmed plan of reorganization." *See* Fee Application, DE #110, at p. 3. And yet Mr. Kapusta insists such ought not be allowed until Mr. Kapusta's remaining fees and expenses of $1,137.50, DE #101, are first paid (being in addition to the $2,694.50 he has already collected on

---

[2] While Mr. Kapusta did follow through in objecting to plan confirmation, *see In re Drain Services, Inc.*, Case No. 23-30352 (Bankr. D.N.D. 2023) at DE #114, an intervening, *sui generis*, event informed part of the objection. The intervening event correlates to a letter dated *prior* to the January 3, 2024 e-mail but received *after* the January 3, 2024 e-mail. The Drain Services objection docketed by Mr. Kapusta is accordingly not a point of focus herein.

account of an interim fee application that was previously paid). This is not a sensible legal position; this is, rather, a seemingly transparent effort to apply undue pressure so as to compel the Reorganized Debtor to act outside the confines of the Plan and prematurely pay Mr. Kapusta.

Axiomatically, "[a] confirmed chapter 11 plan binds the debtor and creditors, whether or not the creditors accepted the plan." *Gen. Elec. Capital Corp. v. Dial Bus. Forms (In Re Dial Bus. Forms, Inc.)*, 283 B.R. 537, 540 (B.A.P. 8th Cir. 2002) (citing 11 U.S.C. § 1141(a)). *See also Lawski v. Frontier Ins. Grp., LLC (In re Frontier Ins. Grp., Inc.)*, 585 B.R. 685, 694 (Bankr. S.D.N.Y. 2018) (". . . a confirmed plan binds, among others, the debtor and its creditors to its terms and vests all property of the debtor's estate in the reorganized debtor unless otherwise provided in the plan. . ."); *In re Charterhouse, Inc.*, 84 B.R. 147, 152 (Bankr. D. Minn. 1988) ("A debtor's creditors and interest-holders commit themselves to the governance of a particular mode of reorganization by acquiescing to confirmation of a plan, and by relying upon the terms and character of that plan in accepting it.").

The Plan in this case is objectively clear about the time for the payment of administrative creditors' claims:

> Pursuant to Section 1191(e) of the Bankruptcy Code, holders of allowed administrative claims will be paid (i) first, out of retainers they are holding at the time their respective fees are approved by this Honorable Court; and (ii) second, out of the proceeds of litigation provided for herein, with all such payments to be made during the life of this Plan.

Plan, DE #88, at § 3.02. And, as intimated in the foregoing passage, such a structure is expressly allowed by the Bankruptcy Code. *See, e.g.*, 11 U.S.C. § 1191(e) ("Notwithstanding section 1129(a)(9)(A) of this title, a plan that provides for the payment through the plan of a claim of a kind specified in paragraph (2) or (3) of section 507(a) of this title may be confirmed under subsection (b) of this section.").

9

Notwithstanding this language, Mr. Kapusta has endeavored—and continues to endeavor—to be paid before other administrative creditors. And, to be sure, DBF has previously assured Mr. Kapusta that he will be paid before DBF (with it being counsel's longstanding practice to not receive post-confirmation payment from estates, in debtor representation cases, unless funds are sufficient to first retire the claims of other administrative professional creditors in full). This gratuitous assurance notwithstanding, Mr. Kapusta's eagerness to be paid, in turn, has invited increasingly-potent collection efforts.

At one point in time, following the first several collection communications from Mr. Kapusta to undersigned counsel, the Debtor's former principal indicated that a check was being sent to Mr. Kapusta, with such information then being relayed to Mr. Kapusta (in no small part to staunch the flow of collection e-mails).[3] For reasons that genuinely appear to be correlative to human error, the check was not actually sent. Mr. Kapusta then first threatened to object to the Fee Application, as part of a spurious default notice delivered to the Reorganized Debtor's counsel:

> As of this date, I have not received payment. This email is 30 day demand for payment under the default notice provision of the approved plan. In addition, if payment is not received by this Monday, I will be filing an objection to the fee application for the chief restructuring officer for failure to provide the services by this position as approved by the court, e.g. failure to make payments approved by the court.

E-mail of April 4, 2025, attached hereto as Exhibit B.

---

[3] Despite CAPEX having a CRO, the Debtor's former principal has retained check-writing privileges for purposes of banking convenience. A regime was established internally, at the time of the CRO's appointment, whereby no checks would be written without the approval of the CRO and the cognizance of reorganization counsel. This regime has been dutifully followed, but still creates an eccentricity where the former principal is required to actually sign and send checks. Fortunately, given the nature of CAPEX's business, check writing is an irregular activity.

After Mr. Kapusta sent the foregoing e-mail, threatening to object to Mr. Schmitz' fee application, so as to leverage payment of Mr. Kapusta's own fees, a cognizant decision was made to not proceed with sending the check.

The foregoing merits emphasis: while human error initially precluded the premature payment of Mr. Kapusta's fees, the non-payment subsequently became an act of intentionality. CAPEX is filing a joinder to this brief and wishes to be fully upfront and candid about this. When the premature payment of fees appeared an unfortunate cost of doing business, CAPEX intended to abide the demand in the interests of efficiency. But when a heavy-handed and legally-indefensible threat then ensued, CAPEX elected to take a stand.

There is simply neither logical nor legal support for the attempted *quid pro quo* of paying Mr. Kapusta's fees prematurely as a means of securing Mr. Schmitz' entitlement to his fees. The CRO stepped into this case at a troubled hour and dutifully served, with his efforts being instrumental to the retirement of a dispute that threatened the viability of reorganization. He was then key to the shepherding of this case through confirmation. For those efforts, in his first case as a CRO, he has sought incredibly meager fees. And yet Mr. Kapusta now seeks to obstruct efforts to approve those fees because Mr. Kapusta apparently wishes to be neither bound by the Plan nor subject to the rigors of Section 1191.

### c.  Mr. Kapusta's Actions are Contra to Subchapter V

It is scant hyperbole to surmise that despite seeking notably lesser fees than the Subchapter V trustee, Mr. Schmitz had a more profound impact upon this case—and was more centrally key to securing a consensual confirmation—than Mr. Kapusta. Mr. Schmitz' prompt attention to matters, and availability to afford critical approvals on short notice, was instrumental to CAPEX's emergence from bankruptcy. His fees do not nearly do justice to the services he rendered, either.

11

And yet Mr. Kapusta, who has already received fees well in excess of those Mr. Schmitz now seeks, wishes to hold up the mere approval of the CRO's fees as an apparent means of strongarming acquiescence to an indefensible demand. Worse, to whatever extent Mr. Kapusta feigns merely concern that Mr. Schmitz may be first paid,[4] the Fee Application is express in seeking only to pay the CRO "in accord with the confirmed plan of reorganization." Fee Application, DE #110, at p. 3.

While the Objection does not run directly contra to the dictates of Section 1183 of the Bankruptcy Code, it is difficult to see the filing as anything less than an afront to the spirit of a Subchapter V trustee's duties and, too, the very spirit of Subchapter V itself. Unfortunately, such appears to be a continuation of efforts that are generally at odds with the role of such a trustee, with Mr. Kapusta's work too often being focused on the oft-needless review of docket entries and attendance of hearings, whilst frequently shirking the substantive opportunities of his position.

As observed by Judge Vaughn of the United States Bankruptcy Court for the Middle District of Florida, "facilitation of a consensual plan is a *principal* duty of the trustee." *In re 218 Jackson LLC*, 631 B.R. 937, 948 (Bankr. M.D. Fla. 2021) (citing *Handbook for Small Business Chapter 11 Subchapter V Trustees*, February 2020, at 2-2, 3-9. Available at: www.justice.gov/ust/file/subchapterv_trustee_handbook.pdf/download) (emphasis in original). *See also In re Ozcelebi*, 639 B.R. 365, 381 (Bankr. S.D. Tex. 2022) ("The subchapter V trustee's special duty to 'facilitate the development of a consensual plan of reorganization' appears nowhere else in the Bankruptcy Code and is specific to subchapter V.") (quoting 11 U.S.C. § 1183(b)(7)).

---

[4] It is difficult to read the Objection as merely seeking assurance that the CRO will not be first paid, insofar as Mr. Kapusta expressly writes, *inter alia*: "Despite language to the contrary in the Debtor's confirmed plan, payment of such Trustee administrative expenses should not be continent. . ." Objection, DE #111, at p. 1.

*Accord In re Louis*, 2022 WL 2055290, 2022 Bankr. LEXIS 1586, at *50 (Bankr. C.D. Ill. June 7, 2022).

Almost none of Mr. Kapusta's time entries in this case—or any of the seven other aforementioned cases—are emblematic of efforts to facilitate the formation of a consensual plan of reorganization, saving and excepting the periodic forwarding of a message from counsel for a creditor to counsel for the debtor. The time entries, rather, are demonstrative of an ethic devoted to the attendance of meetings and hearings, the review of docket entries, and the preparation of fee applications. *See* First Interim Application of Thomas J. Kapusta for Subchapter V Trustee Fees and Expenses, DE #48, at p. 4; Final Application of Thomas J. Kapusta for Subchapter V Trustee Fees and Expenses, DE #101, at p. 4.

There accordingly exists a construct where Mr. Kapusta is not only failing to hew to his statutory role but, too, needlessly billing for tasks that are neither central to his role nor critical to the performance of his duties. *See, e.g.*, *In re Twin Pines, LLC*, 2020 WL 5576957, 2020 Bankr. LEXIS 1217, at *8 (Bankr. D.N.M. Apr. 30, 2020) ("The fact that the U.S. Trustee may object to a debtor's election of subchapter V status up to 30 days after the § 341 meeting also suggests that the appointed subchapter V trustee is not required to attend these meetings.") (citing Interim Fed. R. Bankr. P. 1020(b)).[5]

In fact, the Bankruptcy Code specifically delineates the varieties of hearings at which the Subchapter V trustee is to be present. *See* 11 U.S.C. § 1183(b)(3). And while this case—somehow, in a markedly flukish manner—never occasioned any hearing other than a status conference (which is amongst those for which a trustee is properly present under Section 1183), history shows Mr.

---

[5] At the time of the *Twin Pines* opinion, the cited rule was of an interim variety. The rule has since become a final rule. *See* Fed. R. Bankr. P. 1020.

Kapusta has often derived palpable fees from attending cash collateral hearings (which are not amongst those identified in Section 1183), meetings of creditors (which are spoken to by the *Twin Pines* Court), and initial debtor interviews conducted by the United States Trustee.

To be sure, attendance at a meeting of creditors or an initial debtor interview would *not* be problematic if such established a foundation for future efforts directed toward the formation of a consensual plan. No doubt, numerous Subchapter V trustees attend one or both of these events in each case and, notwithstanding the *Twin Pines* holding, it is difficult to fathom such being cause for objection or alarm in the prism of a traditional case where a trustee uses those occasions to gain familiarity with a debtor and its creditor base as part of a larger effort to then work toward aiding the confirmation of a consensual plan.

Yet Mr. Kapusta has not endeavored to take the knowledge gleaned from these meetings, or first day motions hearings, and then apply such toward negotiations with creditors, the introduction of plan structure concepts, or even the formation of a substantive independent position on ensuing motions. Rather, he appears to utilize these meetings and hearings, alongside his review of docket entries, as simply an occasion to record the entry of billable time, thereafter directing a disproportionate quotient of his efforts toward the collection of correlative fees.

In fairness to Mr. Kapusta, none of the eight cases referenced herein are ones where there have existed both (i) structural impediments to consensual plan formation; and (ii) a factual construct where it appears such could be overcome by the efforts of an "honest broker. . . provid[ing] credibility in evaluating the debtor's business's prospects for a successful reorganization and facility[ating] negotiation of a plan of reorganization with the debtor's stakeholders. . ." *In re Corinthian Commc'n, Inc.*, 642 B.R. 224, 225 (Bankr. S.D.N.Y. 2022). *See*

*also* American Bankruptcy Institute, *Final Report of the American Bankruptcy Institute Subchapter V Task Force* at 23 (2004), available at https://subvtaskforce.abi.org.

Yet the absence of such necessity in cases is not an invitation to nonetheless incur all the fees and expenses that would accompany a matter in which efforts toward the formation of a consensual plan, or the mediation of intraparty tensions, might prove fruitful. If a case—like the one *sub judice*—does not invite occasion for a trustee to meaningfully advance efforts toward consensual plan formation, it is antithetical for the case—and the debtor's estate—to nonetheless be burdened by the fees that would otherwise encompass such an effort. Such monies cease being a useful expense calibrated to aid in an exit from bankruptcy and, instead, take on at least the aura of a tax.

Relevantly, the informal Fargo chapter 11 bar is relatively small and the various constituent attorneys tend to have close professional and/or personal relationships with one another. So there is nothing surprising about the notion that counsel for debtors and counsel for creditors, left to their own devices, are as likely—if not more likely—to identify grounds for consensual plan confirmation than is a trustee who is not similarly moored to the North Dakota insolvency community. And nothing herein ought to be construed as urging to the contrary; indeed, the mind need not venture far to surmise how a trustee's efforts might be construed as meddlesome or counterproductive in this construct.

So there may well be perfectly legitimate design to Mr. Kapusta assuming a more passive role in cases. Should an attorney relatively new to Subchapter V endeavor to file a case, the trustee's role may prove more expansive. Similarly, should a case be filed on behalf of a debtor that can benefit from Mr. Kapusta's restructuring knowhow, the trustee's role may prove more

expansive. No doubt, each case is unique and pliability is key in almost all facets of the bankruptcy process.

Yet, so long as Mr. Kapusta is assuming an inactive posture (as was assuredly true in the CAPEX bankruptcy), he remains bound to not wrongfully utilize his proverbial "idle hands." Fiduciaries—even those of a mostly passive variety—are regularly posed with the placement of an estate's interests above their own and trustee work in bankruptcy has long been rightfully understood to be a profession in which collection risks are omnipresent (as is equally true for the role of debtors' counsel in chapter 11 cases). Unfortunately, though, Mr. Kapusta seems to either lack an appreciation of these realities or simply bear an indifference toward them. It is not merely that the Objection is ill-supported; it is, too, that the Objection is callous.

By population metrics, North Dakota is not a large state. As evidenced by various cases in this Honorable Court over the past two years, that dynamic—especially when coupled with the insular nature of the Fargo business community—is one that can create perceived, if not actual, conflicts of interest. As a necessary extension of this reality, it is nearly inevitable that the services of a CRO will again be required in this Honorable Court, whether in a month's time or a year's time. Finding someone willing to serve in that capacity is not an easy task. Finding someone willing to serve and qualified to serve is an even harder task. And discovering that person, once located, to be judicious with their billing, is nothing short of a small miracle. So it stands to reason that Mr. Schmitz may, before too long, again be called upon to play a role in a chapter 11 case. Yet, if so much as securing approval of a fee application requires confrontation with the zealous

collection efforts of a trustee, there will exist a lingering concern that Mr. Schmitz may not again be so willing to jump into this fray.[6]

Whether or not the services of a reputable CRO are a casualty to this saga remains to be seen, and Mr. Schmitz—commendably—has given no outward indications of such reluctance. But the mere notion that such a concern could at all exist is troubling unto itself. The Objection is plainly devoid of legal merit, appearing to be a brutish form of financial self-promotion at the expense of professional peers. That such has a tendency to deter future demurrers to extrajudicial payment demands and intimidate those who authorize such demurrers is not a bug but, rather, a feature: it very much seems the whole idea is to use heavy-handed tactics to beget compliance. And perhaps that explains, in some small part, why over the past six months some 86.9% of Mr. Kapusta's e-mails to counsel have been in the nature of efforts to collect trustee fees or retainers.

## V.      Conclusion

WHEREFORE, DBF respectfully prays this Honorable Court (i) overrule the Objection; (ii) grant the Fee Application; and (iii) afford such other and further relief as may be just and proper.

Respectfully submitted,

Dated: April 19, 2025          By:    /s/ Maurice B. VerStandig
                                      Maurice B. VerStandig, Esq.
                                      The Dakota Bankruptcy Firm
                                      1630 1st Avenue N
                                      Suite B PMB 24
                                      Fargo, North Dakota 58102-4246
                                      Phone: (701) 394-3215
                                      mac@dakotabankruptcy.com

---

[6] Ironically, it would seem the location of a well qualified Subchapter V trustee may be an easier task, with the local legal community being graced by the services of several excellent insolvency attorneys, including at least one person who has previously served in such capacity with distinction.

17

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 19th day of April, 2025, a copy of the foregoing was served electronically upon filing via the ECF system.

<u>/s/ Maurice B. VerStandig</u>
Maurice B. VerStandig
