IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 24-30422 |
| | ) | (Chapter 11) |
| JAMIESON CAPEX FUND, LLC | ) | |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

**MOTION TO APPROVE COMPROMISE WITH
TIMOTHY KARSKY, COMMISSIONER OF THE NORTH DAKOTA SECURITIES
DEPARTMENT AND THE STATE OF NORTH DAKOTA**

Comes now Jamieson CAPEX Fund, LLC ("CAPEX" or the "Reorganized Debtor"), by and through undersigned counsel, pursuant to Federal Rule of Bankruptcy Procedure 9019, and moves to approve a compromise with Timothy Karsky, in his official capacity as Commissioner of the North Dakota Securities Department ("Commissioner Karsky") and the State of North Dakota (the "State") (Commissioner Karsky and the State being collectively known as the "Defendants" and each as a "Defendant") that will resolve the matter of *Jamieson CAPEX Fund, LLC v. Karsky*, Case No. 24-07030 (Bankr. D.N.D. 2024) (the "Adversary Proceeding"), and in support thereof states as follows:

I.  **Introduction**

The State is holding $150,750.00 of monies, previously destined for CAPEX, and is agreeing to return the full sum of those monies to CAPEX's estate for distribution in accord with the Reorganized Debtor's chapter 11 plan. While this litigation originally sought a greater sum of monies—and, as explained *infra*, it appears additional monies have been held (and partially disbursed) by the State in connection with Secure Income Fund, LLC ("SIF"), which CAPEX asserts, but Defendants do not recognize or concede, is a pass-through subsidiary of CAPEX—the $150,750.00 proposed to be turned over hereunder represents the full sum of currency otherwise

1

destined for CAPEX and actively being held by the State. This is, accordingly, an excellent settlement, representing a complete recovery of the at-issue funds the Reorganized Debtor would have been likely able to obtain if successful at trial.

The proposed compromise will, no doubt, leave more work for CAPEX and potentially SIF. And, yes, it is possible litigation will shortly ensue against a third party who recovered the lion's share of monies held by the State on a ledger correlative to SIF. Yet, for instant purposes, the settlement achieves several compelling ends. Not least among those ends is the introduction of a healthy quotient of cash into the Reorganized Debtor's estate, with cognizance that money can be used to pay all accrued administrative obligations, to fund the retainer of special counsel exploring other potential causes of action, and to begin making a respectable payment to the holders of general unsecured claims.

For these reasons, and as extrapolated upon *infra*, it is respectfully urged this Honorable Court approve the proposed compromise, the terms of which are fully set forth herein.

**II.    Terms of Agreement**

The terms of settlement being proposed are relatively simplistic and straight-forward in nature. In light of this simplicity, and in the interests of avoiding the expenses associated with the formalities of a separate settlement agreement, CAPEX and the Defendants agree—subject to the approval of this Honorable Court—that the following shall fully embody their resolution (the "Settlement Agreement"):

1.    The State shall pay—or cause to be paid—to CAPEX the sum of One Hundred Fifty Thousand Seven Hundred and Fifty Dollars and No Cents ($150,750.00) (the "Settlement Sum"), within ten (10) business days of entry of an order approving the Settlement Agreement.

2. CAPEX will cause the Settlement Sum to be disbursed in accord with the Reorganized Debtor's confirmed chapter 11 plan of reorganization, *provided however* that CAPEX may, in its business judgment as determined by its Chief Restructuring Officer Michael Schmitz, retain part of the Settlement Sum to finance ongoing operational expenses, including the post-confirmation incursion of professional expenses by the entity's chief restructuring officer and legal counsel.

3. CAPEX and the Defendants[1] shall execute a joint stipulation of dismissal, in the Adversary Proceeding, noting such dismissal to be with prejudice as to CAPEX as the Plaintiff regarding its claims against the Defendants, any related State agency, and/or any person employed by the State but expressly reserving such prejudice to not attach to SIF.

4. The parties shall bear their own respective fees and costs in connection with the Adversary Proceeding.

5. This Honorable Court shall retain jurisdiction to adjudicate any disputes arising out of—or related to—this Settlement Agreement.

6. This Settlement Agreement shall be construed in accord with the laws of the United States of America and, where federal law does not prevail, the laws of the State of North Dakota, without regard to any conflict of laws principles.

7. Time shall be of the essence in performing under this Settlement Agreement.

---

[1] It is reasonably anticipated Commissioner Karsky will cease to hold his official position, and the Department he currently heads will cease to exist, imminently. In such an eventuality, any action taken by the State shall be deemed to be one taken by the "Defendants" for purposes of this Settlement Agreement, with CAPEX recognizing Commissioner Karsky is likely to lack the formal capacity to carry on in the ministerial implementation of the compromise.

### III. Standard

Familiarly, ". . . the court may approve a compromise or settlement" upon appropriate notice to parties in interest. Fed. R. Bankr. P. 9019(a).

In this judicial circuit, ". . . the standard for evaluation of a settlement 'is whether the settlement is fair and equitable and in the best interests of the estate.'" *Wigley v. Wigley (In re Wigley)*, 557 B.R. 678, 685 (B.A.P. 8th Cir. 2016) (quoting *Tri-State Financial, LLC v. Lovald*, 525 F.3d 649, 654 (8th Cir. 2008) (citing *Martin v. Cox (In re Martin)*, 212 B.R. 316, 319 (8th Cir. BAP 1997))).

In assessing fairness, equitability, and the best interests of an estate, a bankruptcy court is charged with examination of four factors:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Wigley*, 557 B.R. at 685 (quoting *Drexel Burnham Lambert Corp. v. Flight Transp. Corp. (In re Flight Transp. Sec. Litigation)*, 730 F.2d 1128, 1135 (8th Cir.1984) (quoting *Drexel v. Loomis*, 35 F.2d 800, 806 (8th Cir. 1929))).

### IV. Argument: The Compromise Should be Approved

Insofar as the State is agreeing to turn over to CAPEX the full sum of monies intercepted from CAPEX by the State, it is genuinely difficult to find material downsides in the Settlement Agreement. And the following analysis does, accordingly, carry the intrinsic bias of a Reorganized Debtor that, quite genuinely, cannot conceive of a reason to not make this deal. Nonetheless, there is import in assessing the *Wigley* factors.

In terms of the probability of success in litigation, CAPEX believes it would have been likely to prevail but, equally, recognizes the claims in this case are somewhat novel in nature. The

4

State obtained monies otherwise-destined for CAPEX, doing so in accord with one or more administrative orders. To succeed at trial, CAPEX likely would have been required to not merely show the State was holding such monies but, too, that a sovereign actor does not have a superior entitlement to hold such monies. The Reorganized Debtor believes, in the *sui generis* factual construct of this case, that such a showing could have—and would have—been made. But there is still import in recognizing such was far from a certainty.

Vis a vis the second element of the test, CAPEX does not feign that there would be any difficulty collecting from the State, for self-evident reasons.

In terms of the complexity of the litigation, this case would have been enormously complicated from a legal perspective, even if not from a factual perspective. CAPEX has been urging that a government's intercept of monies, without a subsequent disbursement of those funds, invites turnover liability under Title 11 of the United States Code. There is seemingly no precedent—one way or another—for this proposition. And while there is ample precedent for the avoidance of tax payments, CAPEX did not bring a preference claim because the monies were lost outside the applicable lookback period.

Equally, while the Reorganized Debtor did bring a fraudulent conveyance claim against the State, there likely would have been meaningful contention as to the existence, *vel non*, of reasonably equivalent value. A sovereign actor would assuredly suggest such value to be inherently present when monies are claimed in the furtherance of government work. CAPEX, on the other hand, would have urged no value to have attached *sub judice* and no known exception to exist for sovereign actors.

Finally, this resolution conforms to the paramount interests of creditors, who are best served by seeing monies flow to the Reorganized Debtor with knowledge that those funds can be

used to commence making payments under the plan of reorganization. While $150,750.00 is not a jaw-dropping sum of money, it is more than enough to clear the administrative claims in this case, to pay post-confirmation professional fees, to fund the retainer of a law firm being engaged as conflicts counsel under the same plan, and to still have monies sufficient to make a meaningful distribution to creditors. Equally, by settling now, CAPEX avoids incurring additional legal fees in the Adversary Proceeding that, in turn, would directly cut into the funds available for distribution to unsecured creditors.

V. **SIF**

As noted in the Adversary Proceeding, a significantly larger sum of money—approximately $468,563.49—was also intercepted by the State, in a related transaction. Those funds were otherwise destined for SIF. It is important to address why those funds are not part of the Settlement Agreement.

Through negotiations and informal discovery, CAPEX has come to learn that (i) the State regards monies destined for SIF as *not* being monies destined for CAPEX, and accordingly of a variety not to be properly disbursed to CAPEX; and (ii) approximately $408,610.87 of these monies were, in any event, disbursed to a creditor of CAPEX's (the "Third Party Creditor") during the pendency of CAPEX's bankruptcy, by the State, which had identified the funds as having come from that investor.

For the avoidance of doubt, SIF is *not* releasing any claim it may have to these monies. Nor are SIF or CAPEX releasing any claims they may have against the Third Party Creditor. To the contrary, the Reorganized Debtor is actively assessing the extent, *vel non*, of its fiduciary

6

obligation to now pursue one or more claims against the Third Party Creditor. If and when such claims are brought, they will take the form of a new adversary proceeding.

Perhaps most importantly, though, even if CAPEX could argue the monies destined for SIF are, in fact, the funds of CAPEX, a turnover claim against the State would be unlikely to succeed where, as here, the majority of the monies were disbursed to the Third Party Creditor and are thusly no longer in the possession, custody and control of the State. So CAPEX sees little upside in pursuing this argument when (i) SIF can make the argument in its own name, as to the remaining monies; and (ii) either CAPEX and/or SIF can explore seeking recourse against the Third Party Creditor.

### VI. Conclusion

WHEREFORE, Jamieson CAPEX Fund, LLC respectfully prays this Honorable Court (i) approve the compromise set forth herein; and (ii) afford such other and further relief as may be just and proper.

Respectfully submitted,

Dated: June 30, 2025    By:    /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
The Dakota Bankruptcy Firm
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
Phone: (701) 394-3215
mac@dakotabankruptcy.com
*Counsel for the Reorganized Debtor*

7

Signed Solely to Signify Acquiescence to the Terms of the Settlement Agreement:

/s/ Berly D. Nelson (signed w/ express permission)
Berly D. Nelson (ND #05903)
Ana A. Neir (ND #09142)
Special Assistant Attorney Generals
10 Roberts Street North
Fargo, ND 58102-4982
Phone: 701.232.8957
bnelson@serklandlaw.com
aneir@serklandlaw.com
*Attorneys for the Commissioner of the North Dakota Securities Department and the State of North Dakota*

8

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 30th day of June, 2025, a copy of the foregoing was served electronically upon filing via the ECF system.

I FURTHER CERTIFY that, pursuant to Federal Rule of Bankruptcy Procedure 9019(a), a copy of the notice attached hereto as Exhibit A (but not of this application or the other exhibits) is being sent, on the 1st day of July, 2025, via First Class Mail, postage prepaid, to all parties on the mailing matrix attached hereto as Exhibit B, *except* no copy will be mailed to (i) this Honorable Court; or (ii) attorneys employed by The Dakota Bankruptcy Firm.

/s/ Maurice B. VerStandig
Maurice B. VerStandig